OPINION OF THE COURT
Frederic S. Berman, J.
The defendant stands accused of various counts of criminal possession of a controlled substance and criminal possession of a weapon.
On January 18, 1980, this court rendered a lengthy opinion with respect to its decision on a motion to suppress physical evidence and statements. A copy of that unabridged opinion is contained in the court file and was published in the New York Law Journal on March 13,1980.
Among the many issues presented in this case is one of first impression in New York: does a police officer who gathers information by standing in a common hallway, and placing his ear to the door of an apartment violate the occupant’s Fourth Amendment rights?
Because of the presumed interest of the profession in that issue, this court has been requested to write a supplementary abridged opinion which focuses primarily upon the issue of first impression as it was contained in the original and more lengthy opinion of January 18, 1980.
The court makes the following findings of fact and conclusions of law.
THE FACTS
On March 13, 1979 at approximately 11:00 A.M., Police Officers Robert Flynn and Rocco San Fellipo of the anticrime *500 unit received a radio run of a man with a gun at 515 East 6th Street in Manhattan. Upon responding to the location, the officers observed a man sitting on the steps betwen the first and second floors, holding a partially disassembled gun on his lap. The individual was arrested.
On the way to the precinct, this arrestee turned informant. After receiving adequate Miranda warnings, the informant expressed his apprehension about having been arrested and offered to give information to the officers. He first told of a man with guns in a building with a green door on East 11th Street. The officers cruised East 11th Street and found two buildings with green doors. The informant was unable to say which of the two was the correct building. This inability on the informant’s part, together with a regulation in the anti-crime unit prohibiting officers from entering a building without a supervisor except in an emergency, caused the officers to abandon their investigation.
The officers again started to return to the precinct to begin the arrest process. On the way, the informant told the officers that Bobby Clark (the defendant herein) lived in the apartment outside which he had been arrested. He stated that he had been in the apartment earlier that morning and that he had observed Bobby Clark in possession of a snubnosed .38 revolver, narcotics, a rifle case and other guns. He also stated that Bobby Clark was a dealer in synthetic drugs.
The officers, in keeping with the regulation previously discussed, decided to delay their investigation until their supervisor came on duty.
Sergeant Clark (no relation to the defendant) came on duty between 1:30 and 2:00 p.m. After eating lunch, Officer Flynn resumed his patrol duties, this time in the company of Sergeant Clark and Detective Imshoe. At approximately 3:45 p.m., they were driving on East 6th Street when they decided to investigate the Bobby Clark matter.
The officers entered 515 East 6th Street. They observed the name Clark on the mailbox for apartment B-7. Sergeant Clark spoke with a woman who confirmed that Robert Clark lived in the building. She also stated that she had seen him earlier in the day putting a gun in his boot.
The officers proceeded to the second floor of the building. Sergeant Clark stationed himself outside the door of apartment B-7. Crouching at the door, Sergeant Clark listened for signs of life inside the apartment. He heard one end of an *501 apparent telephone conversation. He then heard an individual in the apartment later to be identified as Charles Fleischer say in substance: "We have to put $8,000 up front as a show of good faith to these guys.” The defendant was heard to respond: "I have $800 here in front of me.”
Within one minute Fleischer opened the door of the apartment. Sergeant Clark drew his service revolver, identified himself as a police officer and stopped Fleischer. While still outside the apartment, the Sergeant testified he could see a zipped up rifle case leaning against a back wall. Visible to his right was the defendant sitting behind a desk. On top of the desk were numerous vials of pills and a stack of money.
Sergeant Clark entered the apartment with Fleischer in custody. Police Officer Flynn and Detective Imshoe followed. Flynn frisked the defendant for weapons but found none. Flynn then observed a .38 snubnosed revolver lying in open view on a partition, a few feet from the defendant. The rifle case was found to contain a loaded rifle. The vials of pills turned out to be methadone, dihydromorphinone and methamphetamine, all controlled substances.
It is the defendant’s position that the police lacked probable cause to enter his apartment and make a seizure. The People argue that there was sufficient probable cause to justify the conduct of the police.
As part of the fact-finding process a Darden hearing was held. (People v Darden, 34 NY2d 177.) It may be of interest to the Bar and Bench to briefly outline the procedure that was followed. Immediately prior to commencing the hearing, a discussion was held in open court during which the court indicated the various areas of questions it intended to cover during the in camera hearing with the informant. The court solicited from defense counsel specific questions which the defendant wished asked of the informant. The court and the Assistant District Attorney retired to the in camera location. The defendant and his counsel remained in the courtroom. The informant was sworn, and questions were put to him by the court. The record was ordered sealed.
The court then returned to the courtroom and gave an oral summary to defense counsel of what was said by the informant. Defense counsel requested the court to ask the informant an additional question. The court went back to the jury room and asked the one additional question as requested by counsel. The court then returned to give a summary of that *502 answer. Subsequently, both counsel were provided with a transcript of the court’s oral summary.
The Darden hearing resulted in a finding that the informant does, in fact, exist; that he was in the apartment in question immediately prior to his arrest; and that the officer testified truthfully in relating the substance of the information stated by the informant.
THE LAW
The police may not make an arrest or search unless they have probable cause to do so. Probable cause exists where known facts and circumstances are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed. (Brinegar v United States, 338 US 160; Henry v United States, 361 US 98; People v Oden, 36 NY2d 382.) It is to be viewed from the vantage point of a reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training. It is the totality of the facts and circumstances which is dispositive.
In determining whether "probable cause” existed, the court will consider separately each of the layers of information utilized by the police in this case: (a) the information from the two informants, (b) the aural surveillance at the defendant’s door, and (c) the officer’s view of the apartment from the hallway.
(a) The Information From the Two Informants
Turning first to the question of the informants, the law recognizes a distinction between persons of unsavory reputation and the citizen informer, with the latter entitled to a presumption of reliability. (People v Hicks, 38 NY2d 90.)
Thus, one of the informants, a woman in the lobby, who told the officers of seeing the defendant put a gun in his boot, is presumed reliable, even though the absence of the informant makes it impossible to verify that she existed or that she gave the information ascribed to her. In People v Arthurs (24 NY2d 688, 693), the court stated: "it is not tenable that a police officer’s word should be so suspect, even in the sensitive area of search and seizure, that it may not be accepted unless corroborated like that of an accomplice criminal or complainant in a sex crime.”
In the instant case, the other informant who was himself *503 under arrest, is in quite another position. His information must be viewed in light of the two-pronged test in Aguilar v Texas (378 US 108).[1] The court must inquire into the informant’s basis of knowledge and his veracity.
The "basis of knowledge” is satisfied if the informant has witnessed the facts which he asserts. (Spinelli v United States, 393 US 410.) The informant in the instant case passed on to the police information that he had been in Robert Clark’s apartment and had observed drugs and weapons in the apartment. Having satisfied the "basis of knowledge” aspect of the Aguilar test, it is necessary to examine the "veracity” of the informant herein. The clearest way of establishing an informant’s veracity is to ascertain if he has given truthful information in the past. Absent such a showing, veracity may be established by the police independently observing incriminating details which corroborate the informant’s story, or by the existence of a relationship between the informant and the police so that the informant is aware that it will not be in his best interest if his information is untrue. (Wong Sun v United States, 371 US 471.)
Both of these situations are present here. The probability that this informant might be lying was lessened when the police received the following corroborative bits of information: from an unidentified woman living in the building, they learned that defendant indeed had a snubnosed .38; they overheard from outside the apartment what they perceived to be a drug-related conversation and finally they observed a large quantity of pills and money inside the defendant’s apartment.
In People v Alaimo (34 NY2d 187) the Court of Appeals held that the observed corroborating facts need not establish probable cause by themselves. It is sufficient if they are unusual and inviting explanation though as consistent with innocent as with criminal activity.
Therefore, the possibility of the informant misstating the facts has been sufficiently reduced by corroborative facts and observations.
Independent of this, the veracity prong is also satisfied by the nature of the relationship between the informant and the *504 police. Under subdivision 3 of section 240.50 of the Penal Law, the informant might have been subject to arrest for falsely reporting an offense had the tip proved incorrect. Thus, the tip was a statement against the informant’s penal interest. (Adams v Williams, 407 US 143.)
(b) The Aural Surveillance at the Defendant’s Door
As a matter of first impression, this court is called upon to decide the legality of the aural surveillance conducted at the defendant’s door. The defendant contends that the police illegally invaded his right of privacy by listening to his statements from the hallway, and that such listening was an impermissible search.
The test to be applied in determining the nature of the right to privacy is whether the person has exhibited a subjective expectation of privacy which is objectively reasonable and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (Katz v United States, 389 US 347.)
Although there are no New York cases on the subject, several United States Court of Appeals opinions have confronted this issue. They have uniformly held that there is not a justifiable expectation of privacy with respect to conversations inside a premise which are audible to the police. This is true so long as the police are where they have a right to be and that the surveillance is conducted with the naked ear. (Cf. United States v Jackson, 588 F2d 1046; United States v Fisch, 474 F2d 1071; United States v Ortega, 471 F2d 1350, cert den 411 US 948; United States v Llanes, 398 F2d 880.)
Justice Brennan, dissenting in Lopez v United States, stated: "The risk of being overheard by an eavesdropper * * * is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.” (373 US 427, 465, quoted with approval in Hoffa v United States, 385 US 293, 303.)
In addition, among the questions which a court may properly ask itself in determining whether particular police conduct falls within the Fourth Amendment is whether law enforcement would be unduly hampered if the particular police practice were subjected to all of the usual Fourth Amendment restraints. (Terry v Ohio, 392 US 1; People v *505 Cunningham, 71 AD2d 559.) This question is particularly apropos in the instant case. These officers were duty bound to conduct an investigation in a high crime area of a certain apartment and its occupant. They were possessed with reasonably good information that the defendant was armed. Lest they find themselves in a gun battle, the only reasonable course open to these officers was to listen at the door and learn as much as they could about the situation confronting them. Certainly, it is unreasonable to require that police officers take unnecessary risks in the performance of their duties. (People v Cunningham, supra.)
The defendant has placed great reliance upon the fact that at one point the officer placed his ear on the door, thus turning the door into a sounding board. In United States v Fisch (474 F2d 1071, 1077, supra), the court refused to draw a distinction based upon where the listener was located in the next room: "True the listening ear was at the keyhole, so to speak, but another listening ear was also, at one time, on the bed in the middle of the room, where was heard the pilot’s story. Appellants would have us divide the listening room into privileged or burdened areas, and the conversation into degrees of audibility to, we presume, the normal ear, thus a remark heard on the bed arguably admissible, but not those heard at the door, a loud remark admissible, arguably one uttered in 'normal’ tones, but definitely not one whispered. We find no precedent for categorization involving such hair-splitting distinctions and we are not disposed to create one.”
The court finds this reasoning persuasive and holds that when the hallway of an apartment building is accessible to the public, listening with the naked ear from the hallway outside the apartment does not intrude upon any justified expectation of privacy of the occupants.
In so holding, the court is not unmindful of the fact that this view has been criticized by at least two writers in the criminal law field. Professor Anthony G. Amsterdam, Professor of Law, Stanford Law School, has written: "But if you live in a cheap hotel or in a ghetto flat, your neighbors can hear you breathing quietly even in temperate weather when it is possible to keep the windows and the doors closed. For the tenement dweller, the difference between observation by neighbors and visitors who ordinarily use the common hallways and observation by policemen who come into the hall *506 ways to 'check up’ or 'look around’ is the difference between all the privacy that his condition allows and none.”[2]
On balance however, the court is persuaded that, under all of the circumstances, the defendant’s subjective expectation of privacy was not reasonable in this case.
(c) The Officer’s View of the Apartment From the Hallway
We now turn to the final layer of information utilized by the police, the view into the apartment. At the time the officers entered the apartment, they knew that the defendant was in possession of something. The critical question is whether there was a sufficient basis for the officer’s determination that the pills were a controlled substance.
The People are unable to show that the officers recognized particular characteristics of the pills which justified the conclusion that they were a controlled substance. However, the People argue that, although the officers’ senses did not provide enough information, other factors were present such as the information from both informants and the overheard conversation.
While each fact alone is suspectible of innocent interpretation, the court must consider the evidence as a whole. For example, the overheard conversation, with its references to "front money” and a large amount of cash being inside the apartment, if taken out of context, could easily be a reference to an impending commodities sale. However, a conversation together with otherwise equivocal behavior may raise the level of inference from suspicion to probable cause. (Cf. People v Brown, 24 NY2d 421; People v Cohen, 23 NY2d 674.)
The court concludes that at the time these officers entered the apartment to arrest the defendant and seize the narcotics they were possessed of sufficient information to warrant a prudent and reasonable police officer’s belief that a crime was being committed. The probable cause flows from the totality of facts and circumstances, even though no one factor is dispositive.
However, no amount of probable cause can justify a warrantless seizure absent exigent circumstances. (Coolidge v New Hampshire, 403 US 443.) Exigent circumstances exist *507 where the police will be unable to make a seizure for which probable cause exists unless they act quickly. Thus, the threat that contraband will be removed or destroyed can constitute exigent circumstances. (Johnson v United States, 333 US 10; People v Clements, 37 NY2d 675.)
 In the instant case, immediate action was warranted by the police in order to prevent the potential destruction of the fruits of the crime. It would have been impractical for them to obtain a warrant. Consequently, the motion to suppress the narcotics seized in the apartment is denied. The motion to suppress the handgun and the rifle, both in plain view of the officers, is likewise denied.

. The Aguilar two-pronged test is applicable to warrantless searches and seizures based on an informant’s tip. (McCray v Illinois, 386 US 300; People v West, 44 NY2d 656.)

. (Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349, 404, quoted in La Fave, Search and Seizure, pp 309-310.)