STATE OF HAWAII, Plaintiff-Appellee, *v.* RUTH KANDA, Defendant-Appellant (Cr. Nos. 5055 & 4933). MASATO BENTOSINO, Defendant-Appellant (Cr. Nos. 5056 & 4934), DAVID WAKI, Defendant-Appellant (Cr. Nos. 5057 & 4935), DAVID KIM, Defendant-Appellant (Cr. Nos. 5058 & 4936), YOSHIO TANAKA, Defendant-Appellant (Cr. Nos. 5059 & 4937), KAZUYOSHI YAMANISHI, Defendant-Appellant (Cr. Nos. 5060 & 4938), and GORDON NAGATA, Defendant-Appellant (Cr. Nos. 5061 & 4939)

NO. 6880

DECEMBER 17, 1980

RICHARDSON, C.J., OGATA, MENOR AND CIRCUIT JUDGE LUM, ASSIGNED BY REASON OF VACANCY*

---

*Retired Justice Kobayashi, who heard oral argument in this case resumed private practice on October 16, 1980, and was therefore unable to continue on the case. See HRS § 602-10 (1980 Supp.), which also provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice.

OPINION OF THE COURT BY OGATA, J.

On September 1, 1977, the herein named seven defendants-appellants, Ruth Kanda, Masato Bentosino, David Waki, David Kim, Yoshio Tanaka, Kazuyoshi Yamanishi and Gordon Nagata (hereinafter appellants), were indicted by the Maui County Grand Jury and each was charged with the offense of possession of gambling records in the first degree in violation of HRS § 712-1224(1).[1] The indictment returned against appellant Kazuyoshi Yamanishi contained an additional count which charged him with the offense of promoting gambling in the first degree in violation of HRS § 712-1221(1)(a);[2] the indictment returned against appellant Gordon Nagata contained three additional counts which charged him with the offenses of promoting gambling in the first degree also in violation of HRS § 712-1221(1)(a). Possession of gambling records in the first degree and promoting gambling in the first degree are classified under our penal code as class C felonies.[3]

On September 8, 1977, all seven appellants appeared before the court below and pleaded not guilty to all charges and demanded jury trial.

On November 8, 1977, the trial court denied appellants' motion to suppress. The appellants have brought this interlocutory appeal

---

[1] Paragraph (1)(a) of this section reads as follows:

§ 712-1224 *Possession of gambling records in the first degree.* (1) A person commits the offense of possession of gambling records in the first degree if he knowingly possesses any writing, paper, instrument, or article:

(a) Of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise, and constituting, reflecting, or representing more than five bets totaling more than $500; . . . .

[2] Paragraph (1)(a) of this section reads as follows:

§ 712-1221 *Promoting gambling in the first degree.* (1) A person commits the offense of promoting gambling in the first degree if he knowingly advances or profits from gambling activity by:

(a) Engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than $500; . . . .

[3] See HRS § 712-1224(2) and HRS § 712-1221(2).

from that order of denial pursuant to HRS § 641-17.[4]

We are thus presented with the single question of whether the affidavits provided a sufficient basis for the district court judge to conclude that probable cause existed for the issuance of the search warrants.

## I.

The record for each of these cases contains the affidavit of Lt. Howard Tagomori of the Vice Division of the Maui Police Department, and the supplemental affidavits of Lt. Ng of the Criminal Intelligence Division and Officer Baisa of the C.I.S. of the Maui Police Department.

The principal affidavit furnished to the district court judge by Lt. Tagomori included the usual prefatory remarks that "he has reason to believe that during the early evening hours of Friday, December 17, 1976, there will be concealed within the premises described in the Search Warrants presented to your Honor along with this affidavit 'Parley,' 'Betting' or 'Point-spread' slips used in bookmaking which show names of football teams and point spreads for football games, and writings, papers, instruments or articles of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise including records of wagers placed in the bookmaking scheme; . . . ."

Thereafter, the affidavit generally described the six-five (6/5) and parley betting operations on the island of Maui. On Wednesdays,[5] the house distributed the betting slips to runners who then distributed them to sub-runners and ultimately to bettors. The betting slips listed the various football games for that week and the point spread between opposing teams. To bet 6/5, the bettor chooses

---

[4] Originally, appellants were separately indicted by the Maui County Grand Jury on May 6, 1977 in Cr. Nos. 4933, 4934, 4935, 4936, 4937, 4938 and 4939 for exactly the same offenses with which they have been presently charged in Cr. Nos. 5055, 5056, 5057, 5058, 5059, 5060 and 5061, respectively. However, the trial court quashed each of these earlier indictments on August 31, 1977.

[5] Affiant originally stated in paragraph 1 of his affidavit that the betting slips were usually distributed by the house on "Tuesdays," but amended that to "Wednesdays" in paragraph 13.

a team in a particular game to win, using the point spread. If his team wins, the bettor wins $5.00; if his team loses, he must pay $6.00. To bet parley, the bettor chooses at least four teams in four games. All four teams must win and the return is nine to one. He may bet up to ten games and increase the odds. Bets were placed with bookies who reported the bets to their superiors or the house. All bets must be placed by Friday at 6:00 p.m. On the following Tuesdays, Wednesdays, and Thursdays, the house distributed the moneys to the runners or bookies, who in turn paid the winners; and the runners also collected moneys from the losers for the house.

Affiant alleged that this investigation began in September of 1976, and continued until the issuance of the warrants. He further stated that all of the information set forth in his affidavit was described by informer #1; that this informer related that the 6/5 operation started this season on Maui with three different books (organizations or houses); however, after some bickering among the three factions, Takeo Yamauchi ended up running the entire Maui operation; and that the subordinates of Yamauchi were Steven "Humpty" Sakamoto who ran the "Lahaina action," and Kazuo Yamanishi (hereinafter "Yama") and Takeshi Kitagawa who ran the central Maui operation. Informer #1 related that the Lahaina operation and the central Maui operation were run separately, but the slips for central Maui came from Lahaina; that "(o)n occasion (usually) betting slips are delivered from Lahaina to Yama" but he sometimes went to Lahaina to pick up the slips from Humpty. This informer further related that the bookies or runners for the central Maui area were Al Oppenheimer, Ruth Kanda, Archie Fukutomi, Masato Bentosino, Melvin Mabe, David Kim, Gordon Nagata, Joseph Viela, Yoshio Tanaka, Natsuo Sato and David Waki.[6] In addition, there were other runners or sub-runners. After Yama received the betting slips, he distributed them to the runners for distribution to the bettors. Occasionally, Kitagawa distributed the slips to the runners. All bets must be reported to Yama by Friday evening; however, bets may be reported after Friday for Monday night football games and other occasions like Thanksgiving Day

---

[6] Six of these eleven named persons are the appellants here; the seventh is appellant Yamanishi, who will be continued to be referred to as "Yama" throughout the remainder of this opinion.

football games. Distribution of the betting slips was made either by the runners picking them up at Yama's house or by Yama or Kitagawa delivering them. After the weekend games were over, Yama contacted the runners and effected the collections and payoffs in cash.

Affiant further stated that on December 16, 1976, the day before the issuance of the search warrants, the informers told Officer Baisa and Lt. Ng that the betting slips had come out late that day.

## II.

The Fourth Amendment to the United States Constitution and Article I, § 7[7] of the Hawaii State Constitution mandate that no search warrant shall issue unless there is a finding of probable cause, supported by oath or affirmation, and particularly describing the place to be searched. The United States Supreme Court established a two-prong test to determine whether an affidavit is sufficient to support a finding of probable cause in *Aguilar v. Texas,* 378 U.S. 108 (1964). The Court stated:

Although an affidavit may be based on hearsay information and need not reflect the direct personal observation of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was "credible" or his information "reliable." [Citations omitted.]

378 U.S. at 114.

We have consistently applied the two-prong *Aguilar* test since its adoption in *State v. Davenport,* 55 Haw. 90, 516 P.2d 65 (1973). *See State v. Decano,* 60 Haw. 205, 588 P.2d 909 (1978); *State v. Kaukani,* 59 Haw. 120, 577 P.2d 335 (1978); *State v. Yaw,* 58 Haw. 485, 572 P.2d 856 (1977); *State v. Delaney,* 58 Haw. 19, 563 P.2d 990 (1977); *State v. Austria,* 55 Haw. 565, 524 P.2d 290 (1974).

---

[7] Article I, § 5 of the Hawaii State Constitution which was in effect at the time the search warrants were issued was renumbered Article I, § 7 as a result of the 1978 Hawaii Constitutional Convention and subsequent ratification.

Accordingly, we said in *State v. Yaw, supra* at 486, 572 P.2d at 858, that an affidavit in support of a search warrant where the affiant relies upon an informer "must reveal an adequate basis for the informer's conclusion regarding the location of the objects sought to be recovered and must further demonstrate that the affiant's trust in the informer's credibility was warranted."

We have no difficulty with the credibility or reliability prong of the *Aguilar* test as applied to the informers in Lt. Tagomori's primary affidavit. His affidavit revealed that most of the information was furnished to affiant by informer #1. Informer #1 related that he has been involved in the 6/5 operation since September of 1976, and that he was involved in the bookmaking operation and profits therefrom other than as a bettor. It was averred that over the past three years informer #1 has given affiant information regarding criminal activities on at least fifteen occasions and on each occasion that information was corroborated. On at least ten of the occasions the information led to arrests. We have held that an informer's past tips need not have resulted in convictions in order to establish a record of reliability. *See State v. Delaney, supra; State v. Austria, supra; State v. Davenport, supra.* We are satisfied that the credibility of informer #1 and the reliability of his information have been amply established.

Very little information was furnished to affiant by informer #2, a citizen informer employed at the Maui Land and Pineapple Cannery. Informer #2 simply related that he worked at the cannery with David Kim who was heavily involved in football gambling; and that on a number of occasions he had heard Kim talking about football odds and bets on football games over the past two months. As we do not attach a great deal of relevance to these statements, informer #2's credibility or reliability is immaterial. However, a citizen informer is entitled to a presumption of reliability. *People v. Clark,* 103 Misc.2d 498, 426 N.Y.S.2d 692 (1980). We have held that information provided by an eyewitness informer to a crime is reasonably trustworthy and no showing of reliability or credibility is required in the affidavit. *State v. Decano, supra* at 211, 588 P.2d at 914.

We next apply the credibility or reliability test to the informers in the supplemental affidavits. We find that Officer Sherman Baisa's supplemental affidavit satisfied the second prong. However, we have difficulty with Lt. Ng's supplemental affidavit. There was no

statement that the informer was a citizen informer or that he was one of the informers mentioned in Lt. Tagomori's primary affidavit.[8] We find that Lt. Ng's affidavit was deficient since it did not establish that the informer was credible or his information reliable.

### III.

We have considerable problem in sustaining the first prong of the *Aguilar* test. The affidavits fail to set-forth the underlying circumstances from which the district court judge could determine that the informer was justified in his conclusion that the gambling slips and other paraphernalia were located within the appellants' residences. The purpose of this requirement is to enable a neutral and detached magistrate to make an independent and informed determination of probable cause. *See Spinelli v. United States,* 393 U.S. 410 (1969); *United States v. Ventresca,* 380 U.S. 102 (1965); *Aguilar v. Texas, supra; Giordenello v. United States,* 357 U.S. 480 (1958); *Johnson v. United States,* 333 U.S. 10 (1948); *United States v. Lefkowitz,* 285 U.S. 452 (1932).

In *Aguilar, supra* at 112, the United States Supreme Court, quoting *Nathanson v. United States,* 290 U.S. 41, 47 (1933), stated:

> Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts and circumstances presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough.

We held in *State v. Austria, supra* at 566, 524 P.2d at 292, that the affidavit was sufficient to support the issuance of a search warrant where the informer alleged that he "personally observed and participated in the gambling activity on several occasions." *See also State v. Decano, supra; State v. Kaukani, supra; State v. Delaney, supra; State v. Davenport, supra; United States v. Harrick,* 582 F.2d 329 (4th Cir. 1978).

---

[8] However, we note that it is plausible that this informer was the same person mentioned in the primary affidavit since paragraph 7 of that affidavit states: "informers described in the Affidavits of Officer Baisa and Lt. Ng informed them that the betting slips had come out late that day."

44

In the instant case, although informer #1 related that he bet in the 6/5 games and was involved in the "bookmaking operation and profits from the scheme other than as a bettor," he did not specify whether his gambling activity was confined to the Lahaina area as contrasted with the central Maui area. In addition, there are no facts or circumstances in the affidavit to support his allegation that the "bookies or runners for central Maui are Al Oppenheimer, Ruth Kanda, Archie Fukutomi, Masato Bentosino, Melvin Mabe, David Kim, Gordon Nagata, Joseph Viela, Yoshio Tanaka, Natsuo Sato and David Waki."

A bookie is defined in Webster's Third New International Dictionary as a "bookmaker"; a bookmaker is defined as "one that determines odds and receives and pays off bets"; and a runner is defined as "an agent who accepts, transmits, and pays bets for a numbers game or a bookmaker." In the instant case, the affidavits fail to state that any of the appellants were observed accepting bets, transmitting information to or collecting moneys for the house, or paying the winners.

Moreover, there is no allegation that this informer or affiant observed any gambling paraphernalia within any of the residences of the appellants or that any of them had even been within those residences.[9] We are of course mindful that only the probability, and not a prima facie showing, of criminal activity is needed to establish probable cause. *Beck v. Ohio,* 379 U.S. 89, 96 (1964); *State v. Decano, supra* at 209, 588 P.2d at 913.

The district court judge could not have determined that the informers were justified in their conclusion that there was probable cause to search the residences of the appellants. Since the informers' tips did not satisfy the *Aguilar* test, we next examine whether the other information in the affidavit supported a finding of probable cause.

---

[9] The only place in the record where there is an allegation that the informer personally saw gambling slips is in Officer Sherman Baisa's supplemental affidavit. The last paragraph reads: "The informant further related that on at least two occasions he saw Humpty distributing betting slips since September, 1976. The informant related that he has seen slips being distributed at Continental on Kupanakea Street." However, this paragraph has reference only to Lahaina operation, and is not pertinent to the central Maui operation.

 

## IV.

We find nothing unusual or significant in the police surveillances reported in Lt. Tagomori's affidavit. The report simply stated that on October 26, 1976, Kitagawa and Yama went for a short morning tour of the waterfront area of Kahului, Maui; and that during that trip Yama exited the vehicle and met Joseph Viela. There is absolutely nothing to indicate what they may have discussed. On Wednesday, November 10, 1976, Kitagawa and Yama were seen driving into the Maui Land and Pineapple Cannery. There was no allegation that both or either had stopped there and talked to David Kim; but it was simply alleged that David Kim was employed at the Maui Land and Pineapple Cannery. Also on that day, Kitagawa and Yama were seen stopping at Hawaiian Groceries, a business establishment owned by Yoshio Tanaka, on Wakea Avenue, Kahului, Maui; and that Yama entered the office area of Hawaiian Groceries and stayed therein for two minutes.

The surveillance report for Wednesday, November 17, 1976, indicated that Yama dropped off a package to David Kim at the Maui Pineapple Cannery area at an unspecified time; and that Yama was seen passing papers to Yoshio Tanaka of Hawaiian Groceries at the Kahului Shopping Center. Yama was then seen going to the State Baseyard located at NASKA (Naval Air Station Kahului); and thereafter Yama drove to Natsuo Sato's house. Later that day, Yama was seen going to Melvin Mabe's house at 4:08 p.m., Ruth Kanda's house at 4:15 p.m., and then to Mabe's house at 5:26 p.m. A few minutes later, Yama went to Gordon Nagata's house. Yama was also seen delivering brown paper bags to Nagata, Mabe and Tanaka; but the affidavit failed to describe the size and shape of the bags.

On Thursday, November 18, 1976, Archie Fukutomi, who owns the Maui Fire Control, was seen leaving Takeo Yamauchi's house in Lahaina, Maui.

On Tuesday, November 23, 1976, the surveillance report stated that Yama and Kitagawa spent all of their time in Lahaina at the Continental U-Drive office from about 1:00 p.m. until 6:20 p.m. when the surveillance was terminated. That report stated that at "2011 hrs [8:11 p.m.] Kitagawa's vehicle was seen within the garage area of Yoshi Nagata located at 94 South Wakea Street, Kahului, Maui, Hawaii." However, we note that the report previously stated

that Gordon Nagata lived at that address. Kitagawa's vehicle was later seen turning onto Puolo Street, Kahului, where Masato Bentosino lives, and then stopping at Melvin Mabe's house.

The surveillance report for Tuesday, November 30, 1976, showed that Yama had gone to the parking area of the Maui Land and Pineapple Cannery in the morning. At 2:19 p.m., a vehicle registered to David and Blossom L. Kim arrived at Yama's house; at 4:15 p.m. Nagata arrived at Yama's house. At about 4:30 p.m., Yama went to Ruth Kanda's house; at about 4:41 p.m., he turned onto Puolo Street, Kahului. Then at 4:53 p.m., Archie Fukutomi arrived at Yama's house. At 5:03 p.m., Yama went to Natsuo Sato's house .and met with Sato; at 5:41 p.m., Yama arrived at Alvin Oppenheimer's house; at 5:50 p.m., he arrived at David Waki's house, and at 6:05 p.m., he arrived at Melvin Mabe's house.

On Wednesday, December 8, 1976, the last day of the police surveillance, David Kim arrived at Yama's house at about 1:00 p.m., and left after ten minutes. At about 4:00 p.m., Archie Fukutomi arrived at Yama's house and left after about five minutes. At about 6:25 p.m., Yama left his house and arrived at Humpty Sakamoto's house in Lahaina at about 7:00 p.m. Yama did not exit his vehicle and talked to an unidentified person in front of Sakamoto's house. He drove to the Continental U-Drive office, entered the office, and talked to an oriental male. Yama then drove directly to Al Oppenheimer's house in Wailuku arriving at 8:00 p.m. At about 8:06 p.m., he drove to Masato Bentosino's house; at 8:15 p.m., he arrived at Melvin Mabe's house; at 8:20 p.m., he arrived at Natsuo Sato's house, but he did not enter Sato's house, apparently because of the presence of guests; at 8:25 p.m., he arrived at Ruth Kanda's house and carried a large paper bag into the house.

We believe that these observations do not justify the police officers' conclusion that the appellants were engaged in criminal activities. In *United States v. Mirallegro*, 387 F.2d 895 (7th Cir. 1967), the defendant was convicted in the district court for accepting wagers and for failure to file a special tax return and application for registry-wagering. On appeal, he contended that his motion to suppress should have been granted. It appeared that a search warrant had been issued to search the premises in question by a United States Commissioner "upon the affidavit of a special agent that 'he has reason to believe' that certain records and wagering paraphernalia

concealed on said property were being used in the business of accepting wagers and he (Pike) was satisfied 'that there is probable cause to believe that the property so described is being concealed on the premises above described and that the foregoing grounds for application of the search warrant exists.' " *Id.* at 896-97.

While the government contended that the facts and circumstances contained in the affidavit were sufficient to support a finding of probable cause, the United States Court of Appeals for the Seventh Circuit reversed and remanded the case. The court in *Mirallegro* quoted *Giordenello v. United States, supra* at 486, where the Supreme Court stated "[t]he Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion . . . ." *Supra* at 898.

The affidavit in *Mirallegro, supra,* stated that on six consecutive days, defendant was observed leaving his residence, picking up a sports news from a news vendor, and then proceeding to a certain address where he would spend some three hours for reasons unknown to the affiant. The Seventh Circuit held that the affidavit was factually insufficient to establish probable cause for the issuance of a search warrant to search the premises where defendant had spent some three hours of his six days.

Likewise, in *Gillespie v. United States,* 368 F.2d 1 (8th Cir. 1966), the defendants were convicted on charges relating to interstate gambling activities and then appealed claiming that the district court had erred when it determined that the affidavit presented to the municipal judge together with some oral testimony by the affiant provided probable cause for the issuance of a search warrant. In *Gillespie, supra,* an officer in the vice bureau of the police department presented to the judge a printed legal form which contained a caption reading: "Information for a Search Warrant" below which there appeared the name Joseph Gillespie and his address. The body of the instrument consisted of an affidavit which included the statement "that he [affiant] had good reason to believe 'that certain gambling devices, to-wit: Cards, Dice, Faro, Roulette Wheel, Klondyke Table, Poker Table, Punchboard, Keno Layouts' were located on the described premises." *Id.* at 3. The officer testified before the district court that he had orally told the magistrate that "we had checked with Internal Revenue, and that Joe Gillespie had a current

wagering stamp; that we had done some checking and obtained information that indicated that he was currently in the gambling business." *Id.* No other information had been furnished to the magistrate in the issuance of the search warrant.

The Eighth Circuit Court of Appeals reversed defendants' convictions and held "[t]he officer's affidavit that he believed and had good reason to believe that the gambling devices enumerated in the printed form were located oñ the premises was, of course, as held by the District Court, not sufficient by itself to constitute probable cause, since the statement was purely conclusory on the part of the officer, in that it did not set out any 'underlying circumstances' which could provide basis or reason for a belief." *Id.* at 4, *citing United States v. Ventresca, supra* at 108-09.

In *Spinelli v. United States, supra,* one of the allegations made in the affidavit for a search warrant stated that "William Spinelli is known to this affiant and to the federal law enforcement agents and local law enforcement·agents as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers." *Id.* at 414. The court was quick to dispose of that allegation as "a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision." *Id.* We similarly dispose of the allegation in this affidavit that the appellants, other than Yama, are bookies or runners.

The fact that the surveillance reports in the affidavit show that appellant Yama visited these alleged bookies mostly in the early afternoons and evenings in October and November of 1976, that a vehicle registered to David and Blossom Kim was seen at the residence of Yama, and that at various times in the afternoon he had visitors at his residence is insufficient to reasonably infer that these visits were made to promote a gambling operation.

In *People v. Wirchansky,* 41 N.Y.2d 130, 359 N.E.2d 666, 391 N.Y.S.2d 70 (1976), the New York Court of Appeals held that the police observations of conduct which was as consistent with innocent activity as it was with criminal activity was insufficient to support a finding of probable cause. The court stated:

> Even paying great respect to the specialized knowledge of the police officer in this situation, we cannot say that the conduct described in the affidavit was susceptible of only one interpretation — criminal activity. Although defendant's conduct was sus-

picious, he may have been entering the apartment building for innocent purposes totally unrelated to the gambling operation, and thus his conduct would not sustain a finding of probable cause.

*Id.* at 134-35, 359 N.E.2d at 669-70, 391 N.Y.S.2d at 74. Similarly, in the instant case, the appellants' activities may have been innocent or social in nature,[10] since no gambling paraphernalia was seen during these surveillances.

Lt. Tagomori's conclusion, based upon his affidavit and the accompanying affidavits, that the appellants were involved in a gambling operation and concealed gambling paraphernalia within their residences was unjustified. The facts and circumstances presented in the affidavit must be sufficient for a reasonably cautious person to conclude that the items sought in connection with the crime are probably located within the premises to be searched at the time the warrant is issued. *See Spinelli v. United States, supra; Aguilar v. Texas, supra; Jones v. United States,* 362 U.S. 257 (1960); *United States v. Williams,* 605 F.2d 495 (10th Cir.), *cert. denied,* 444 U.S. 932 (1979); *United States v. Valenzuela,* 596 F.2d 824 (9th Cir.), *cert. denied,* 441 U.S. 965 (1979); *Durham v. United States,* 403 F.2d 190 (9th Cir. 1968); *United States v. Mirallegro, supra; State v. Decano, supra; State v. Yaw, supra; State v. Kalai,* 56 Haw. 366, 537 P.2d 8 (1975); *State v. Davenport, supra.* At the most "[a]ll we have here is 'highly suspicious' conduct and such suspicions do not amount to probable cause." *People v. Wirchansky, supra* at 136, 359 N.E.2d at 671, 391 N.Y.S.2d at 75.

We have said in *State v. Yaw, supra* at 491, 572 P.2d at 860, that "[w]here the facts and reasonable inferences from those facts are capable of supporting the district court judge's finding of probable cause, his determination will be upheld on review, even though other inferences from those facts may support a different conclusion." *State v. Kalai, supra; State v. Austria, supra.* We will not invalidate a warrant by interpreting the affidavit in a hypertechnical, rather than a common sense manner. *See Spinelli v. United States, supra; United States v. Ventresca, supra; State v. Decano, supra; State v. Kaukani, supra; State v. Kalai, supra; State v. Austria, supra; State v. Davenport, supra.*

---

[10] We note that Ruth Kanda is the sister of Yama.

However, we "are mindful of the responsibility of the judiciary in this State to resist erosion of the constitutional right to privacy. To this end, this court has never hesitated to subject assertedly unreasonably police searches to a rigorous judicial scrutiny." *State v. Austria, supra* at 567, 524 P.2d at 293. Even the United States Supreme Court has stated in *Aguilar v. Texas, supra* at 111:

> Although the reviewing court will pay substantial deference to judicial determinations of probable cause, the court must still insist that the magistrate perform his "neutral and detached" function and not serve merely as a rubber stamp for the police.

We conclude therefore that the search warrants should not have been issued for these premises because the affidavits did not provide a sufficient basis for a finding of probable cause. The motion to suppress filed by each appellant should have been granted.

Therefore, the order denying the motion to suppress is reversed, and these cases are remanded for further proceedings not inconsistent with this opinion.

*David C. Schutter (Randall Y. K. Char* with him on the briefs, *Schutter, O'Brien & Weinberg* of counsel) for defendants-appellants, Kanda, Bentosino, Tanaka and Nagata;

*John T. Vail* (also on the briefs) for defendants-appellants Waki, Kim and Yamanishi.

*James B. Takayesu,* Deputy Prosecuting Attorney, County of Maui, *(Boyd P. Mossman,* Prosecuting Attorney, County of Maui, on the brief), for plaintiff-appellee.