173 P.3d 498

**STATE of Hawai'i, Plaintiff–
Appellee–Respondent,**

v.

**Michael SPILLNER, Defendant–
Appellant–Petitioner.**

**No. 27722.**

Supreme Court of Hawai'i.

Dec. 24, 2007.

8. Having so held, we need not consider the alternative arguments raised by 'Ōlelo.

Brian R. Vincent, Deputy Prosecuting Attorney, for the plaintiff-appellee-respondent State of Hawai'i.

Okechukwu Amadi, Deputy Public Defender (DPD), (Deborah L. Kim, DPD, on the application; Lila C.A. King, DPD, on the briefs), for the defendant-appellant-petitioner Michael Spillner.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., Dissenting Separately.

Opinion of the Court by LEVINSON, J.

On July 20, 2007, the defendant-appellant-petitioner Michael Spillner filed an application for a writ of certiorari urging this court to review the summary disposition order (SDO) of the Intermediate Court of Appeals (ICA) in *State v. Spillner*, No. 27722, 113 Hawai'i 507, 155 P.3d 690, 2007 WL 1114121 (Haw.App. Apr. 13, 2007) [hereinafter, "the ICA's SDO"], which affirmed the 'Ewa district court's January 4, 2006 judgments, the Honorable Valerie W.H. Chang presiding, convicting him of and sentencing him for one count each of driving while unlicensed, in violation of Hawai'i Revised Statutes (HRS) § 286–102 (1993 & Supp.2002) (offense one), and driving without motor vehicle insurance, in violation of HRS § 431:10C–104 (Supp. 1997) (offense two). In his application, Spillner asserts that the district court erred: (1) in denying his motion to suppress the fruits of the March 1, 2005 traffic stop, during which Honolulu Police Department Officer Arthur Takamiya cited Spillner for offenses one and two; and (2) in convicting him on the basis of illegally obtained evidence. On August 21, 2007, this court granted Spillner's application and, on October 31, 2007, we heard oral argument.

For the reasons discussed herein, we conclude that Spillner's points of error are ultimately meritless and, therefore, affirm the ICA's April 24, 2007 judgment on appeal.

## I. BACKGROUND

On February 15, 2005, Officer Takamiya stopped Spillner for sporting illegal window tinting on his vehicle and, during the stop, determined that Spillner had neither a valid driver's license nor insurance for his vehicle. Officer Takamiya stopped Spillner's vehicle again, a week later, upon observing that the illegal tinting had not been removed. At the time of the second stop, Spillner's girlfriend was driving the vehicle, which, Officer Takamiya determined, was still uninsured. Then, on March 1, 2005, Officer Takamiya once again stopped Spillner, driving the same vehicle, and cited him for offenses one and two.

### A. Spillner's Pretrial Motion To Suppress And The Trial

On August 15, 2005, Spillner filed a motion to suppress "evidence obtained from warrantless ... seizures of [Spillner] and/or [his] property," which the district court consolidated with its bench trial. Spillner asserted that:

1. ...

a. ... [T]he justification for the search and seizure conducted by ... [O]fficer [Takamiya] was based on prior contact with [Spillner].

b. ... [O]fficer [Takamiya] could not have known if [Spillner] had obtained a driver's license or ... insurance[ ] subsequent to the prior contact....

....

e. The interrogation effectuated upon [Spillner] constitute[d] a seizure.

2. The stop and seizure of [Spillner]'s person and property was not supported by ... a reasonable suspicion based on specific articulable facts ... that any criminal activity was afoot.

....

4. The charges against [Spillner] constitute fruits of the unlawful stop and seizure.

....

... "[B]ut for" the unlawful invasion, the evidence ... would not have been obtained.

(Citing U.S. Const. amends. IV (prohibiting "unreasonable searches and seizures"), XIV (concerning due process); Haw. Const. art. I, § 7 (prohibiting "unreasonable searches, seizures and invasions of privacy"); *State v. Bolosan,* 78 Hawai'i 86, 890 P.2d 673 (1995).)

On November 30, 2005, the district court conducted both the trial and the hearing on Spillner's motion to suppress. The only witness was Officer Takamiya, who testified for the plaintiff-appellee-respondent State of Hawai'i [hereinafter, "the prosecution"]. The prosecution elicited the following testimony on direct examination:

Q ... [W]ere you assigned on foot or in a vehicle on March 1st[, 2005]?

A In a vehicle.

Q And what brought your attention to [Spillner] ...

....

... [o]n that very day?

....

A I saw ... [his] vehicle making a right turn....

....

Q And what brought your attention to [him?] I know you saw the vehicle, but what made it stand out?

A ... [O]ne to two weeks prior to this day, I cited ... Spillner in the exact same vehicle for having illegal front tints and no driver's license and no insurance.

Q ... [Y]ou were able to recognize the defendant?

A Yes.

Q He was fresh on your mind?

A Yes.

Q And did you recognize the car[ ] or ... the person?

A ... [B]oth.

....

Actually, I recognized the car first and then I could see through the front windshield because the tints were removed, ... and I could see ... Spillner driving.

Q And you recognized his face?

A Yes.

Q ... Upon making this observation, what were you thinking?

A That ... Spillner was driving without a license and no insurance.

Q And what made you ... think that?

A Because I cited him one to two weeks prior[ ]

....

... [f]or driving without [a] license and ... without insurance and also the illegal ... tinted windshield.

Q So, upon making these observations, what was your next move?

....

A I located him between a quarter mile to half a mile up the street....

....

Q ... And he....

A ... pulled over.

Q ... [A]nd once you stopped, who did you see behind the wheel?

A ... Spillner.

....

Q ... Was he alone in the vehicle?

A Yes.

**Q** And did you ask him for his ... license?

**A** I did knowing that he didn't have one, but I still asked him for one.

**Q** And what was his response?

**A** He said he doesn't have one.

.... [ (Objection to speculation overruled.) ]

**Q** ... [D]id [Spillner] make any statements at this point?

**A** Not that I recall.

....

**Q** ... [D]id you ask for his proof of insurance?

**A** Yes....

**Q** Was he able to provide that ... ?

**A** No....

**Q** What was his response?

**A** I'm not exactly sure word for word, but he basically told me that he didn't have any insurance.

(Some ellipses added and one in original.) At this point, Spillner essentially requested that the court strike Officer Takamiya's response in accordance with Spillner's motion to suppress. The court indicated that it "w[ould] take [Spillner's] objection under advisement." Spillner's counsel then cross-examined Officer Takamiya as follows:

**Q** ... [Y]ou did not observe any outward signs of any traffic violations, isn't that true?

**A** That's true.

....

**Q** And he pulled over without incident?

**A** Yes.

....

**Q** And you pulled him over ... on the assumption that he had no driver's license and was not insured?

**A** Yes.

....

**Q** Now, from [your earlier traffic stop of Spillner] to March 1st, 2005, you don't have any first-hand knowledge whether or not he obtained a license in those two weeks, isn't that true?

**A** That's true.

**Q** You don't have any first-hand knowledge whether or not he obtained insurance ... in those two weeks, isn't that true?

**A** That's true.

....

**Q** You just assumed based on your prior encounter with him that he wasn't insured and he had no license?

....

**A** ... As far as the driver's license, that's an assumption. As far as the insurance, I stopped his girlfriend driving that same truck one week prior without insurance with the same tinted front windshield.

**Q** ... But between the time that you stopped and cited his girlfriend and when you stopped and cited him on March 1st, ... you don't have any first-hand knowledge whether or not the vehicle was insured in that one week's time?

**A** That's correct.

The district court also received into evidence, over Spillner's objection, what purported to be a self-authenticating record from the City and County of Honolulu's Division of Motor Vehicle, Licensing and Permits demonstrating that Spillner did not have a license on March 1, 2005. Without express reasoning, the district court denied Spillner's motions to suppress and for judgment of acquittal. As memorialized in its January 4, 2006 judgments, the district court found Spillner guilty as charged and sentenced him to a total of $149.00 in fees, 330 hours of community service, and a one-year suspension of driving privileges.

B. *The ICA's Disposition Of Spillner's Appeal*

On January 20, 2006, Spillner filed a timely notice of appeal. On direct appeal, he reiterated, *inter alia,* his position that his "stop and seizure ... was not supported by ... a reasonable suspicion based on specific and articulable facts ... that any criminal activity was afoot. The interrogation was therefore without ... justification. The evidence obtained ... and the resulting charges con-

stitute 'fruits of the poisonous tree.' " (Citing *State v. Poaipuni,* 98 Hawai'i 387, 392, 49 P.3d 353, 358 (2002).) Specifically, Spillner argued that, inasmuch as Officer Takamiya, by his own admission, witnessed no violation in progress, he stopped Spillner's vehicle solely on the "assumption that Spillner had no driver's license and that the vehicle was not insured," based in turn on the traffic stop that had occurred two weeks earlier. (Emphasis omitted.) (Citing *United States v. Sandoval,* 829 F.Supp. 355, 360 (D.Utah 1993) (mem.), *rev'd,* 29 F.3d 537, 538 (10th Cir.1994); *Robinson v. State,* 388 So.2d 286, 290 (Fla.Dist.Ct.App.1980).) Spillner attempted to distinguish *State v. Kaleohano,* 99 Hawai'i 370, 56 P.3d 138 (2002), by noting that, in contrast to the police officer in *Kaleohano,* whose "prior knowledge of the motorist's criminal history ... 'heightened' ... initial suspicions," Officer Takamiya had no " 'specific articulable facts indicating the probability of current criminal activity' " aside from the prior violations. (Emphasis omitted.) (Quoting *Kaleohano,* 99 Hawai'i at 380, 56 P.3d at 148.) If anything, Spillner maintained, it would have been "more reasonable" for Officer Takamiya to assume from Spillner's having removed the illegal tinting by the time of the instant stop that he had obtained insurance and a license in the interim as well.

In its answering brief, the prosecution simply countered that Officer Takamiya's "observ[ing Spillner]" driving a motor vehicle "one to two weeks after" their earlier encounter *was* a "specific and articulable fact[ ]" that would give rise to a reasonable suspicion. (Citing *State v. Bohannon,* 102 Hawai'i 228, 237, 74 P.3d 980, 989 (2003).) The prosecution added that none of the cases cited by Spillner "involve an 'ongoing' offense, ... a past citation for [which] may provide a basis for reasonable suspicion because there is an assumption ... that the condition that le[ ]d to the prior citation may very well still exist, absent any concrete in-

formation to contradict that assumption." (Quoting *State v. Decoteau,* 681 N.W.2d 803, 806 (N.D.2004) ("When an officer observes a person driving a vehicle, and the driver's license was suspended when the officer stopped him one week earlier, it is far from a 'mere hunch' to suspect the driver's license is still under suspension.").) (Citing *United States v. Hope,* 906 F.2d 254 (7th Cir.1990).)

In his reply brief, Spillner attempted to distinguish *Decoteau* on the basis that the driving privileges of the defendant in that case presumably would have been suspended for a definitive period of time, such that observing the defendant driving within that period of revocation (assuming the officer knew the duration of such period) would create a reasonable suspicion in and of itself, whereas Officer Takamiya had no reason to believe that Spillner had not applied for and received a license during the intervening two weeks and obtained insurance during the intervening one week.

In its SDO, the ICA decided that Officer Takamiya "had 'reasonable suspicion that [Spillner] was engaged in criminal conduct,' " ICA's SDO at 1 (quoting *State v. Eleneki,* 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004)), and, therefore, affirmed the district court's denial of Spillner's motion to suppress, the judgment, and the sentence imposed, *id.* at 1–2.

## C. *The Application For A Writ Of Certiorari And Oral Argument*

On July 20, 2007, Spillner filed an application for a writ of certiorari, which this court granted on August 21, 2007. On October 31, 2007, we conducted oral argument on the issue of whether Officer Takamiya's brief detention of Spillner violated Spillner's constitutional protections against unreasonable searches and seizures, as guaranteed by the fourth amendment to the United States Constitution [1] and article I, section 7 of the Hawai'i Constitution.[2]

1. The fourth amendment to the United States Constitution provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

2. The wording of article I, section 7 of the Hawai'i Constitution is virtually identical to its federal counterpart, providing in relevant part that "[t]he right of the people to be secure in their persons, houses, papers and effects against un-

At oral argument, Spillner essentially contended that independent reasonable suspicion warranting a brief detention could never exist for the crimes of driving without a license or insurance. Rather, he argued that the criminal activity could only be discovered as an incident of an independent traffic violation observed by an officer, which would serve as an independent justification for stopping the vehicle. He also maintained that, regardless of how often an officer had stopped an individual for driving without insurance, the officer would never have independent grounds for reasonable suspicion to conduct a brief investigatory stop in order to ascertain the state of the vehicle's insurance, even if the stop were proximate in time to multiple previous violations.

The prosecution emphasized that reasonable suspicion, while more than a mere hunch, does not rise to the level of probable cause. It conceded that it was possible for Spillner to have corrected both his unlicensed condition and to have obtained insurance on his vehicle, but maintained that that did not preclude the officer from being reasonably suspicious that Spillner was engaged in an ongoing violation when the officer observed him operating his vehicle, particularly in light of the fact that the second stop of the vehicle, a week after the initial encounter, revealed that Spillner had not, in the interim, obtained insurance.

## II. STANDARD OF REVIEW

■ A trial court's ruling on a motion to suppress evidence is reviewed *de novo* to determine whether the ruling was "right" or "wrong." *State v. Edwards*, 96 Hawai'i 224, 231, 30 P.3d 238, 245 (2001) (citing *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)). The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

reasonable searches, seizures and invasions of

*See State v. Wilson,* 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999) (citations omitted).

*Kaleohano,* 99 Hawai'i at 375, 56 P.3d at 143.

## III. DISCUSSION

A. *Reasonable Suspicion Requires An Articulated Rationale That Supports The Conclusion That Criminal Activity May Be Afoot, Sufficient To Justify A Brief, Investigatory Stop.*

■ There is no dispute that a traffic stop is a form of seizure for constitutional purposes. *See, e.g., Bohannon,* 102 Hawai'i at 237, 74 P.3d at 989 (citing *Bolosan,* 78 Hawai'i at 92, 890 P.2d at 679). That being the case, the fruits of such a traffic stop are illegally obtained and subject to suppression on the defendant's motion unless

> "the police officer [can] point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* ... 392 U.S.[1,] 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 [ (1968) ]. The ultimate test in these situations must be whether from these facts, measured by an objective standard, a [person] of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate. [*State v. Barnes,*] 58 Haw. [333,] 338, 568 P.2d [1207,] 1211 [ (1977) ] (citations omitted).

*State v. Powell,* 61 Haw. 316, 321–22, 603 P.2d 143, 147–48 (1979).

[*Bolosan,* 78 Hawai'i at 92, 890 P.2d at 679] (some brackets added and some omitted).

*Bohannon,* 102 Hawai'i at 237, 74 P.3d at 989; *see also State v. Kearns,* 75 Haw. 558, 569, 867 P.2d 903, 908 (1994) ("[T]he police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot." (Citing *State v. Melear,* 63 Haw. 488, 493, 630 P.2d 619, 624 (1981).)). In analyzing whether reasonable suspicion supported a stop, this court considers the totality of the circumstances. *See, e.g., State v. Prender-*

privacy shall not be violated...."

*gast,* 103 Hawai'i 451, 454, 83 P.3d 714, 717 (2004); *Bohannon,* 102 Hawai'i at 238, 74 P.3d at 990.

The United States Supreme Court recently, in considering the reasonableness of drug-interdiction traffic stops, expounded on the "reasonable officer" standard employed when weighing the totality of the circumstances:

> When discussing how reviewing courts should make reasonable—suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *See, e.g., [United States v. Cortez,* 449 U.S. 411,] 417–[ ]18[, 101 S.Ct. 690 (1981) ].* This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might elude an untrained person." *Id.* [ ] at 418[, 101 S.Ct. 690]. *See also Ornelas v. United States,* 517 U.S. 690, 699[, 116 S.Ct. 1657, 134 L.Ed.2d 911] (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere " 'hunch' " is insufficient to justify a stop, *Terry,* ... [392 U.S.] at 27[, 88 S.Ct. 1868], the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, [*United States v.] Sokolow,* [490 U.S. 1,] 7[, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ].

*United States v. Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (Some internal citations omitted.) Moreover, the *Arvizu* Court "recognized that the concept of reasonable suspicion is somewhat abstract," *id.* at 274, 122 S.Ct. 744, and that "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct," *id.* at 277, 122 S.Ct. 744.

Spillner, nevertheless, interprets the "objective standard" to mean that the theoretical reasonable observer may not consider the knowledge of any prior contacts in forming reasonable suspicion. In other words, Spill-

ner urges that, absent an overt, immediate predicate justification for the traffic stop, such as an illegal maneuver by the driver, the fact that the driver was inadequately credentialed a week or two prior to the instant stop does not justify a stop today. We disagree.

B. *Whereas An Officer May Not "Round Up The Usual Suspects," Reasonable Suspicion Can Be Grounded In The Belief That A Particular Individual Is Engaged In Ongoing Criminal Activity.*

The myriad decisions regarding reasonable suspicion decided by courts across the nation—all grounded in a fact-intensive, case-by-case approach—turn on a careful balance between the importance of the state interests implicated and the protections afforded citizens against unreasonable interference with their persons and their effects. As the United States Supreme Court articulated in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), one of the landmark decisions concerning the standard for reasonable grounds for effecting traffic stops,

> [t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents, in order " 'to safeguard the privacy and security of individuals against arbitrary invasions....' " *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312[, 98 S.Ct. 1816, 56 L.Ed.2d 305] (1978), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528[, 87 S.Ct. 1727, 18 L.Ed.2d 930] (1967). Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.

*Prouse,* 440 U.S. at 654–55, 99 S.Ct. 1391 (footnotes and some internal citations omitted); *see also Kaleohano,* 99 Hawai'i at 379, 56 P.3d at 147 ("Determining whether a seizure pursuant to a temporary investigative stop is constitutional also involves a 'weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and

the severity of the interference with individual liberty.'" (Quoting *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).)).

The *Prouse* Court held that effecting a traffic stop upon a vehicle, absent any observed violations of the traffic or vehicle codes, solely to check on the validity of the driver's license and insurance, amounted to an unreasonable seizure in violation of the fourth amendment to the United States Constitution. 440 U.S. at 663, 99 S.Ct. 1391. The State of Delaware had argued that the police officer's random stop was justified by the state's interest in promoting safe highways, but the Court responded that "[t]he question remains ... whether in the service of these important ends the discretionary spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail," *id.* at 660, 99 S.Ct. 1391. The Court required "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered," *id.*, because unprompted checks of randomly selected vehicles was not likely to yield more unlicensed drivers or unregistered vehicles than would requiring police officers to articulate a specific rationale supporting reasonable suspicion that a *particular* driver was operating an unregistered vehicle or driving without a license. *Id.* at 660–61, 99 S.Ct. 1391. Weighing the intrusion into constitutionally protected areas affected by the stops against the lack of evidence that such stops advanced the interests of highway safety, the Court concluded that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure ... at the unbridled discretion of law enforcement officials." *Id.* at 661, 99 S.Ct. 1391.

■ The danger of "the unbridled discretion of law enforcement officials," *id.*, also prohibits law enforcement from basing a stop solely on an officer's knowledge of a particular citizen's criminal background:

> [K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the

requisite reasonable suspicion. That is the direct thrust of our opinion in *United States v. Santillanes*, 848 F.2d 1103, 1107–08 (10th Cir.1988), ... and we have found no case elsewhere that even suggests the contrary....

If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a *reasonable* suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake (*United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)):

> We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*Sandoval*, 29 F.3d at 542–43 (emphasis in original), *quoted in United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir.2006) ("'[K]nowledge of a person's prior criminal involvement ... is alone insufficient to give rise to the requisite reasonable suspicion,'" because "[u]nder the Fourth Amendment our society does not allow police officers to 'round up the usual suspects'"); *see also Robinson*, 388 So.2d at 290 (vacating the denial of the defendant's motion to suppress and remanding for discharge of the defendant where the court concluded that the police officer on airport patrol effected the stop of the defendant based solely on the officer's personal knowledge of the defendant's criminal past). While this court has not fully articulated its view of the proper role that a defendant's criminal record plays in formulating reasonable suspicion-assuming, given the fact-intensive nature of the inquiry, that

such an articulation is even possible-it has favorably quoted the language from *Sandoval* and has "rejected the notion that a person's prior reputation ..., standing alone, was sufficient to establish *probable cause* for an arrest and [has concluded that], at best, [it] was entitled to only minimal weight when combined with other elements." *Kaleohano*, 99 Hawai'i at 377, 56 P.3d at 145 (quoting *State v. Kanda*, 63 Haw. 36, 48, 620 P.2d 1072, 1080 (1980) (emphasis added)).[3]

 Nevertheless, we must be careful to distinguish (1) an officer's improper reliance, in forming reasonable suspicion, on a defendant's *past* law violations that have come to an end from (2) an officer's reliance on knowledge of a suspected *ongoing* law violation engaged in by the individual in question; the former, if relied upon alone to justify the stop, represents a violation of a citizen's reasonable expectation to be left alone and our society's abhorrence of police practices that " 'round up the usual suspects,' " *Laughrin*, 438 F.3d at 1247, while the latter, if properly informed by the facts, represents good police work. Indeed,

> [a]lthough we have already emphasized that a person's prior history of drug arrests is insufficient to establish probable cause, awareness of past arrests may, when combined with other specific articulable facts indicating the probability of current criminal activity, factor into a determination that reasonable suspicion, sufficient to warrant a temporary investigate stop, exists. *See United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir.1995) (emphasizing that "[k]nowledge of ... recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a *Terry* stop." (Emphasis in the original.)).

*Kaleohano*, 99 Hawai'i at 380, 56 P.3d at 148. We have also noted that

[n]either the fourth amendment nor the Hawai'i Constitution

> require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

*Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)); *see also Deboy v. Commonwealth*, 214 S.W.3d 926, 928–29 (Ky.Ct.App.2007) (distinguishing the well-established proposition that a driver's criminal record alone can never justify an investigatory stop from the ongoing nature of the offense of driving with a suspended license, which rendered the officer's suspicion reasonable based on personal knowledge that the defendant's license had been suspended several months before) (citing *Decoteau*, 681 N.W.2d at 806). In sum, articulated facts that indicate that an' offense is ongoing in nature support reasonable suspicion that criminal activity continues to be afoot and, therefore, help justify a brief investigatory stop to confirm or dispel those suspicions.

Spillner challenges this conclusion as applied to the instant matter. He contends that, regardless of how close in time prior criminal activity is with current activity of a similar nature, the prior activity cannot be a factor in the analysis of reasonable suspicion and that an officer's prior knowledge of past violations, standing alone, can never, as a matter of law, authorize a traffic stop predicated solely upon the officer's suspicion that a driver is committing the offenses of driving without a license or driving without adequate insurance.

This absolutist proposition is demonstrably flawed. Let us posit that, late one evening, an officer effects a valid traffic stop of a vehicle after witnessing an uncontested violation of the traffic or vehicle safety codes and, incidental to that valid stop, the officer dis-

---

**3.** It is equally generally uncontroverted that an unreasonable stop, even if temporary, is one in which "the officer purposefully embarked on what was legally nothing more than a fishing expedition, apparently ' "in the hope that some-thing might turn up." ' " *Sandoval*, 29 F.3d at 544 (quoting *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir.1994) (quoting *Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975))).

covers that the driver is not merely without his or her license but is, in fact, unlicensed to drive in the jurisdiction. Upon encountering the same individual later the same evening, once again driving—at a time during which the license-issuing authority has not yet reopened—the officer would have more than reasonable suspicion to effect a second brief traffic stop of the driver to investigate whether he or she is driving without a license. Reasonable suspicion can, therefore, be established that the defendant has fixedly refused to cease prior criminal behavior, personally observed by the officer, absent other observed violations of the traffic or safety codes.

Even in light of a more protracted interval, however, during which the individual *could* have corrected the former criminal behavior, a police officer may nevertheless have reasonable suspicion that the person has, in fact, failed to amend his or her behavior. To extend the hypothetical, if the second encounter occurs *after* the licensing authority has reopened, it would then be *conceivable* for the defendant to have renewed his or her license in the interim—the realistic likelihood of the defendant doing so increasing with the passage of time—but, depending on the particular facts informing the officer's decision, reasonable suspicion could still warrant effecting a traffic stop of the driver, despite the *possibility* of innocence, because "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744; *see also United States v. Cortez–Galaviz*, 495 F.3d 1203, 1208 (10th Cir.2007) ("Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further.") (concluding that reliance on twenty-day old information that the driver did not have insurance did not render the investigatory stop unreasonable); *Decoteau*, 681 N.W.2d at 806 (explaining that "[t]he reasonable suspicion standard does not require an officer to rule out every possible innocent excuse ... before stopping a vehicle for investigation," and, insofar as "[p]robabilities, not hard certainties, are used in determining

reasonable suspicion," concluding that "[t]he officer's suspicion is not rendered unreasonable merely because the driver's license may have been reinstated in the intervening week").

C. *Insofar As (1) In Matters Involving Ongoing Criminal Activity, Timeliness Of Information Is Of Less Import For Reasonable Suspicion Analysis, (2) The Interval In The Present Matter Was Relatively Short, And (3) Officer Takamiya Acted On A Perceived Pattern Of Ongoing License And Insurance Violations, The Stop Was Supported By Reasonable Suspicion.*

1. *Timeliness of the information is of less import in ongoing violations.*

The United States Court of Appeals for the Sixth Circuit recently observed that the timeliness—the "freshness" or "staleness"—of the information upon which the officer relies plays less of a factor in reasonable suspicion analysis if the offense is of an ongoing nature:

> In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. *See United States v. Greene*, 250 F.3d 471, 480 (6th. Cir.2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness.") *Driving without a valid license* is a continuing offense—in contrast, say, to a speeding or parking violation....

*United States v. Sandridge*, 385 F.3d 1032, 1036 (6th. Cir.2004) (emphasis added). The United States Court of Appeals for the Tenth Circuit recently concurred:

> [W]e note at the outset that timeliness of information is but one of many factors in the mix when assessing whether reasonable suspicion for an investigatory detention exists, and the relative importance of timeliness in that mix depends on the nature of the criminal activity at issue. *See, e.g., United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir.2005). Thus, for example, when the legal infraction at issue typically wears on for days or weeks or months (like, say, *driving without a license* or

appropriate emissions and safety certifications), rather than concludes quickly (like, say, jaywalking or mugging), the timeliness of the information on which the government relies to effect an investigative detention "recedes in importance" compared to other factors, such as the type and duration of [the] offense at issue. *Id.; see also United States v. Mathis,* 357 F.3d 1200, 1207 (10th Cir.2004) (noting that "ongoing and continuous activity makes the passage of time less critical when judging the staleness of information" (internal quotation omitted)).

*Cortez–Galaviz,* 495 F.3d at 1209 (emphasis added). This court has reached the same conclusion, in the context of ascertaining whether probable cause existed to support the issuance of a search warrant:

> If there is a reasonable basis in the affidavit for the conclusion that the criminal activity alleged by the informer is of a continuing, ongoing nature, the passage of time between the informer's last observations of that activity and the issuance of a warrant is less significant than when no such showing is made in the affidavit.

*State v. Austria,* 55 Haw. 565, 570, 524 P.2d 290, 294 (1974) (concluding that a delay of twenty-one days did not render the information stale). And, ultimately,

> [the] existence [of reasonable suspicion] is assessed on a case-by-case basis, in light of all attendant circumstances. When evaluating a claim of staleness, courts do not measure the timeliness of information simply by counting the number of days that have elapsed. Rather, a court must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information.

*United States v. Pierre,* 484 F.3d 75, 83 (1st Cir.2007).

2. *The nature of the ongoing offense informs the analysis of whether suspected criminal activity is still afoot.*

Under circumstances in which the freshness of the officer's information, when combined with the nature of the license revocation or suspension, has precluded—or all but precluded—a defendant from obtaining the required credentials, courts have concluded that the stop was supported by reasonable suspicion. *See, e.g., Stewart v. State,* 220 Ga.App. 295, 469 S.E.2d 424, 425 (1996) (determining that, where the officer knew that the defendant had had his license revoked, a traffic stop of the defendant, upon observing the defendant driving, was supported by reasonable suspicion); *State v. Duesterhoeft,* 311 N.W.2d 866, 868 (Minn.1981) (concluding that, where the shortest suspension period for a license was thirty days, the officer's personal knowledge that the defendant's license had been suspended one month prior to the stop was sufficient to establish reasonable suspicion and "was not the product of whim or caprice or desire on the part of the officer to harass the defendant"); *Decoteau,* 681 N.W.2d at 806 (reasoning that a one-week interval between knowledge of the suspension and the current stop did not render the information stale nor the stop unreasonable); *State v. Gibson,* 665 P.2d 1302, 1304–05 (Utah 1983) (holding that reasonable suspicion warranted a stop effected fifteen months after the last encounter with the defendant where the officer knew that the defendant's license had been suspended for at least a year).

Conversely, where the information relied upon by the officer was so "stale" that, when considered in light of the length of the license suspension or the ease in obtaining the proper credentials, the logical link between the former illegal activity and any suspicion of current, ongoing criminal activity had dissolved with the passage of time, courts have concluded that investigatory stops were unreasonable. *See, e.g., McReynolds v. State,* 441 So.2d 1016, 1017–19 (Ala.Crim.App.1983) (one year stale); *Moody v. State,* 842 So.2d 754, 758 (Fla.2003) (noting that "when, as in this case, as many as three years pass[ ] without any further information about a person's driving status, and, when, as in this case, that person's license can be restored through a simple administrative process, the staleness of the officer's information is indeed an important factor," and ruling the stop unreasonable); *Boyd v. State,* 758 So.2d 1032, 1036 (Miss.Ct.App.2000) (reasoning that because eight years had passed since the officer last knew that the defendant's license was suspended and the officer did not know

the length of the suspension, the stop was not supported by reasonable suspicion); *Commonwealth v. Stevenson*, 832 A.2d 1123, 1125, 1130–32 & n. 9 (Pa.Super.Ct.2003) (holding that, where the officer did not know the length of the defendant's license suspension and in light of the three-year interval between the officer's last knowledge of the defendant's license status and the present stop, the stop was unreasonable under Pa. Const. art. 1, § 8).

Within these extremes lies a range where reasonable suspicion generally resides. We deem *Sandridge* and *Laughrin* to be particularly instructive "bookends" with respect to the period of time during which an officer may have reasonable suspicion that a driver is engaged in an ongoing offense such as driving without a license.

In both cases, a police officer pulled the defendant over solely on the basis of the defendant's prior lack of a valid license. In *Sandridge*, the officer had run a license status check on the driver twenty-two days earlier, 385 F.3d at 1034; in *Laughrin*, the challenged stop followed the prior contact by twenty-two weeks, 438 F.3d at 1246. In *Sandridge*, the United States Court of Appeals for the Sixth Circuit upheld the district court's denial of the defendant's motion to suppress, rejecting the defendant's argument that "any reasonable suspicion" had grown "stale" in light of the passage of twenty-two days. *See* 385 F.3d at 1036 (internal quotation signals omitted). On the other hand, the *Laughrin* court distinguished *Sandridge*, reasoning that "[t]wenty-two days is significantly less than 22 weeks," such that, in the absence of any particular knowledge on the officer's part as to "the length of the prior suspension," his "information was too stale to justify stopping [the defendant]," based on the five-month interval between the officer's knowledge of Laughrin's suspended license and the present stop. *See* 438 F.3d at 1247–48.

3. *On the facts in the record, the stop was supported by reasonable suspicion.*

 We believe that *Sandridge*, *Laughrin*, and other foreign cases support the district court's and the ICA's implicit conclusion that (1) Officer Takamiya's one-week-old knowledge that Spillner's truck did not carry valid insurance—and that he had not acted to remedy the insurance violation in the preceding week-long interval—and (2) his two-week-old knowledge that Spillner was unlicensed were together sufficiently fresh to give rise to reasonable suspicion to execute the March 1, 2005 traffic stop. *See generally Pierre*, 484 F.3d at 84 (reasoning that the fact that (1) the officer had personal knowledge that the defendant's license had been suspended for the entire previous year and (2) the officer had not been informed by fellow officers that the defendant's license status had changed—where such information would be of interest in the on-going investigation—lent credence to the officer's assumption that the defendant's license remained suspended and holding, therefore, that reasonable suspicion justified the stop of defendant for driving without a valid license five months later); *State v. Wade*, 673 So.2d 906, 907 (Fla.Dist.Ct.App.1996) ("a little less than two weeks" not stale); *State v. Carrs*, 568 So.2d 120, 120–21 (Fla.Dist.Ct.App.1990) ("two days to a week" not stale); *Decoteau*, 681 N.W.2d at 806 (recognizing reasonable suspicion despite the possibility that "the driver's license may have been reinstated in the intervening week"). Indeed, as the court noted in *Cortez–Galaviz*,

> the resolution of particularized and objective yet still ambiguous—potentially lawful, potentially unlawful—facts is the central purpose of an investigative detention. *See Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity."); *Terry*, 392 U.S. at 22[, 88 S.Ct. 1868] (recognizing "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest").

495 F.3d at 1206.

4. *Moreover, the stop was reasonable in light of the interests advanced and the limited nature of the intrusion.*

 Ultimately, as noted *supra,* we analyze the reasonableness of a traffic stop

by weighing the interests advanced by enforcing licensing, insurance, and other laws related to highway safety against the nature and degree of the intrusion by law enforcement into motorists' private lives. *Prouse*, 440 U.S. at 654–55, 99 S.Ct. 1391; *Kaleohano*, 99 Hawai'i at 379, 56 P.3d at 147. Where a brief investigatory stop, based on particularized information regarding a specific driver, advances the important state interest in highway safety, courts have determined that such stops are not unreasonable intrusions into the private sphere protected by the fourth amendment. *See, e.g., Carrs*, 568 So.2d at 121 (applying the *Prouse* analysis, weighing the state's interest in highway safety against the nature of the intrusion, and concluding (1) that, unlike in *Prouse*, the interests of highway safety *would* be advanced in the case before it where, one week after an officer stopped the defendant for driving with an expired license, he observed the defendant driving again, and (2) that the stop was, therefore, based upon reasonable suspicion).

Driving is a privilege, not a right. *State v. Davia*, 87 Hawai'i 249, 257, 953 P.2d 1347, 1355 (1998) (noting the legislature's finding to that effect). The state has a legitimate interest in ensuring the vehicles on its roadways are properly insured and operated by licensed drivers. Weighing that against the nature of the intrusion in the present case, where the facts demonstrate that Officer Takamiya had a reason "to pluck this needle from the haystack of cars on the road for investigation," *Cortez–Galaviz*, 495 F.3d at 1206–a reason that was likely to advance the state's interest in highway safety-leads us to conclude the stop was reasonable. *Cf. Prouse*, 440 U.S. at 663, 99 S.Ct. 1391 (holding that where the stop was truly random and had no underlying rationale that demonstrated stopping the defendant's car rather than any other car on the highway would advance highway safety, the stop was unreasonable). The facts in the present matter indicate that Officer Takamiya selected Spill-

ner neither at random nor based upon Spillner's previous criminal history, *i.e.*, by rounding up the usual suspects, *cf. Laughrin*, 438 F.3d at 1247; *Sandoval*, 29 F.3d at 542–43, in order to pursue a general intuition that unauthorized driving was in the air. Neither does the record reflect that Officer Takamiya was engaged in a "fishing expedition," *Sandoval*, 29 F.3d at 544. Rather, the facts indicate that Officer Takamiya reacted to a specific and articulable belief, held particularly as to Spillner, that Spillner's recent behavior of driving without a license and insurance was ongoing, meaning that he had not desisted by either refraining from driving or investing the time and paperwork to obtain the necessary renewals.[4] *Cf. State v. Bonds*, 59 Haw. 130, 130–32, 134, 136, 138, 577 P.2d 781, 782–84, 786–87 (1978) (wherein the officer "pulled [the defendant driver] over for the purpose of ascertaining whether [the driver] possessed a reconstruction permit as required by … ordinance," but without even a hunch that the driver lacked such a permit or was committing any other violation, mandating suppression of the nunchakus and marijuana found in the car). Certainly, the fact known personally by Officer Takamiya, that Spillner had not obtained insurance on his vehicle one week after being advised that he was required by law to do so, indicated a cavalier attitude on Spillner's part toward the law and was sufficient to justify a brief field detention by Officer Takamiya to ascertain whether continued criminal activity were afoot. To conclude otherwise on these facts would be to decide that an officer in Officer Takamiya's shoes, when confronted with a driver who has been stopped repeatedly in recent weeks for driving without a valid license or insurance and who is driving again, must ignore "'recent relevant criminal conduct,'" *Kaleohano*, 99 Hawai'i at 380, 56 P.3d at 148 (quoting *Feliciano*, 45 F.3d at 1074), and, instead, "shrug his shoulders and allow a crime to occur," *id.*, at 380, 56 P.3d 138, 56 P.3d at 148 (quoting *Adams*, 407 U.S. at 145, 92 S.Ct. 1921).

---

4. *See Cortez–Galaviz*, 495 F.3d at 1209 (characterizing driving without a license as an ongoing offense); *Laughrin*, 438 F.3d at 1248 ("It might be argued that [the o]fficer … had reasonable suspicion to stop Mr. Laughrin based not on his *criminal history*, of driving without a valid license, but on the *ongoing violation* of driving without a valid license.…"); *Sandridge*, 385 F.3d at 1036 ("Driving without a valid license is a continuing offense—in contrast, say, to a speeding or parking violation.…").

## IV. CONCLUSION

In light of the foregoing reasoning, we affirm the ICA's April 24, 2007 judgment on appeal.

Dissenting Opinion by ACOBA, J.

I respectfully dissent.

The stop of Petitioner/Defendant–Appellant Michael Spillner (Petitioner) on March 1, 2005 by the police, was an unconstitutional seizure under article I, section 7 of the Hawai'i Constitution [1] because the police did not have reasonable suspicion based upon specific and articulable facts that Petitioner was operating a motor vehicle without a license in violation of Hawai'i Revised Statutes (HRS) § 286–102 (1993 & Supp.2002) [2] or without insurance in violation of HRS § 431:10C–104 (Supp.1997).[3]

1. Article I, section 7 of the Hawai'i State Constitution states as follows:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Because in this context a violation of the state constitution which affords broader rights within its jurisdiction would control on whether a violation occurred under the federal constitution or not, a violation of the former would be dispositive. *State v. Maganis*, 109 Hawai'i 84, 87, 123 P.3d 679, 682 (2005) (stating that "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution" (internal quotation marks and citation omitted)). United States Supreme Court opinions, however, may be cited as persuasive but not controlling authority in such instances, even though subsequently qualified or overruled by that court. *See Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (stating that "[i]f [a] state court decision indicates clearly and expressly that it is alternatively based on a bona fide separate, adequate, and independent grounds, [the U.S. Supreme Court], of course, will not undertake to review the decision"). This dissent expressly rests on "separate, adequate, and independent [state] grounds[.]" *Id.*

2. Hawai'i Revised Statutes (HRS) § 286–102 provides in relevant part:

## I.

In *State v. Barnes*, 58 Haw. 333, 568 P.2d 1207 (1977), this court applied the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that in order "[t]o justify an investigative stop, short of arrest based on probable cause, 'the police officer must be able to point to *specific and articulable facts* which, taken together with *rational inferences* from those facts, *reasonably* warrant that intrusion.'" *Barnes*, 58 Haw. at 338, 568 P.2d at 1211 (emphases added) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). In other words, "a police officer may stop an automobile and detain its occupants if that officer has a reasonable suspicion that the person stopped was engaged in criminal conduct." *State v. Eleneki,* 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004)

> (a) ... *No person*, except one exempted under section 286–105, one who holds an instruction permit under section 286–110, one who holds a provisional license under section 286–102.6, one who holds a commercial driver's license issued under section 286–239, or one who holds a commercial driver's license instruction permit issued under section 286–236, *shall operate any category of motor vehicles listed in this section without first being appropriately examined and duly licensed as a qualified driver* of that category of motor vehicles.
> (b) *A person operating the following category or combination of categories of motor vehicles shall be examined* as provided in section 286–108 *and duly licensed* by the examiner of drivers:
> ....
> (3) Passenger cars of any gross vehicle weight rating, buses designed to transport fifteen or fewer occupants, and trucks and vans having a gross vehicle weight rating of fifteen thousand pounds or less....

(Emphases added.)

3. HRS § 431:10C–104 provided in relevant part:

> (a) Except as provided in section 431:10C–105, *no person shall operate or use a motor vehicle* upon any public street, road, or highway of this State at any time *unless such motor vehicle is insured* at all times under a motor vehicle insurance policy.
> (b) *Every owner of a motor vehicle* used or operated at any time upon any public street, road, or highway of this State *shall obtain a motor vehicle insurance policy* upon such vehicle which provides the coverage required by this article *and shall maintain the motor vehicle insurance policy* at all times for the entire motor vehicle registration period.

(Emphases added.)

(internal quotation marks, citation, and emphasis omitted).

Reasonable suspicion, in turn, requires *"more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (emphasis added) (internal quotation marks and citation omitted). *See also State v. Heapy*, 113 Hawai'i 283, 292–93, 151 P.3d 764, 773–74 (2007) (holding that "[t]he mere possibility of criminal activity does *not* satisfy the constitutional requirement that a stop be based on suspicion that criminal activity was afoot" (internal quotation marks and citation omitted)); *State v. Goudy*, 52 Haw. 497, 501, 479 P.2d 800, 803 (1971) (explaining that rules governing an investigative stop under *Terry* require "that such an intrusion upon personal liberty must be reasonable and be based on something more substantial than inarticulate hunches").

Furthermore, reasonable suspicion for purposes of an investigative stop is "measured by an objective standard." *State v. Bolosan*, 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995). *See also Eleneki*, 106 Hawai'i at 180, 102 P.3d at 1078 (stating that "[a] seizure or stop based on reasonable suspicion ... is tied to *some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity* " (internal quotation marks and citation omitted)) (emphasis added). In short, "[t]he ultimate test" for determining whether a traffic stop is reasonably warranted is "whether from [the] facts, measured by an objective standard, *a [person] of reasonable caution would be warranted in believing that criminal activity was afoot* and that the action taken was appropriate." *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679 (emphasis

added) (internal quotation marks and citation omitted).

The aforementioned standards apply expressly to investigative stops. Persons may not be subject to such a stop unless it is in accordance with such standards. As explained in *Terry*, the "entire rubric of police conduct" entails "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat" that "as a practical matter could not be[ ] subjected to the warrant procedure." 392 U.S. at 20, 88 S.Ct. 1868. Nonetheless,

> the *notions which underlie both the warrant procedure and the requirement of probable cause remain fully relevant in this context* .... And [thus,] in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

*Id.* (footnote omitted) (emphasis added). Consequently, officers may not circumvent these strictures and detain individuals on the pretext that they are merely verifying or checking certain facts or circumstances. *See Brendlin v. California*, — U.S. —, —, — n. 2, 127 S.Ct. 2400, 2404, 2405 n. 2, 168 L.Ed.2d 132 (2007) (The state conceded that the police officers lacked reasonable suspicion to justify stopping a vehicle that displayed a temporary operating permit and expired registration tags in an attempt "to verify that the permit matched the vehicle" where there was nothing unusual about the permit or the manner in which it was affixed and as the vehicle had an application for registration renewal associated with it, the vehicle was expected to have a temporary operating permit.).[4]

4. *Brendlin* must be compared with *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *Rakas*, the petitioners sought to suppress evidence of a rifle and rifle shells seized from the vehicle in which they were passengers on the grounds that the search violated their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* at 130, 99 S.Ct. 421. The *Rakas* court rejected the petitioners' claims because they owned neither the vehicle nor the items in question that were seized from the vehicle and therefore "made no showing that they had any legitimate expectation of

privacy" in the areas that were searched. *Id.* at 148, 99 S.Ct. 421.

In contrast, the defendant in *Brendlin* "did not assert that his Fourth Amendment rights were violated by the search" of the vehicle in which he was a passenger, but instead "claimed only that the traffic stop was an unlawful seizure of his person." *Id.* at —, 127 S.Ct. at 2404. Consequently, the defendant moved to suppress the introduction of methamphetamine production equipment seized during the police search of the vehicle. *Id.* The *Brendlin* court held that the defendant "was seized" at the time the vehicle was stopped "and it was error to deny his sup-

## II.

Petitioner was cited on February 15, 2005, by Officer Arthur Takamiya (Officer Takamiya or the officer) for operating a motor vehicle without a license and without insurance, and for operating a vehicle with illegal tint on its front windshield. Approximately one week later Officer Takamiya cited Petitioner's girlfriend for operating the same vehicle without insurance and for the illegal tint which still remained on the front windshield of the vehicle. Officer Takamiya again stopped Petitioner on March 1, 2005. Petitioner was operating the same vehicle involved in his February 15, 2005 citations and in the subsequent week's citation of his girlfriend. The illegal tint on the front windshield had been removed by the time of this stop. The officer again cited Petitioner for operating a motor vehicle without a license and without insurance. It is this last stop that is at issue.

Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) candidly acknowledged at oral argument that officers typically issue citations under HRS § 286–102 for operating a vehicle without a license even if the operator has a valid license but does not have it in his physical possession at the time of a stop.[5]

The officer forthrightly stated that on March 1, 2005, the date of the stop, he had no specific or articulable facts giving rise to a reasonable suspicion that Petitioner lacked a license or insurance. He also agreed that he *"did not observe any outward signs of any traffic violations"* committed by Petitioner.

pression motion on the ground that seizure occurred only at the formal arrest." *Id.* at ——, 127 S.Ct. at 2410. In effect, under *Brendlin*, persons in a vehicle *would* have standing to suppress the fruits of an illegal search if in conjunction therewith they had been illegally stopped.

Therefore, practically speaking, *Rakas's* rule precluding challenge by a passenger lacking property or possessory interests in a vehicle or in objects seized from the vehicle, to the introduction of the fruits of a search and seizure, does not apply if the stop was improper. The end result, in light of *Brendlin*, and notwithstanding *Rakas*, is that in such a case, a passenger may successfully suppress the introduction into evidence of items seized during a search of a vehicle not belonging to the passenger.

This end result is congruent with the automatic standing rule accorded defendants charged with possession crimes previously believed to be applicable in this jurisdiction. *See State v. Tau'a*, 98 Hawai'i 426, 441, 49 P.3d 1227, 1242 (2002) (Acoba, J., dissenting, joined by Ramil, J.) (stating that a defendant passenger "who is in possession of contraband has automatic standing to challenge the legality of any search and seizure by virtue of the protection afforded a person with respect to his or 'effects' under article I, section 7 of the Hawai'i Constitution"); *see also* Kathleen J. Curran, *Search and Seizure—Hawai'i's Failure to Conduct an Independent and Thorough State Constitutional Analysis of the "Automatic Standing" Rule Effectively Ignores the Hawai'i Constitution's Protection of Citizens' "Effects" from Unreasonable Searches and Seizures*, 34 Rutgers L.J. 1353, 1361, 1365 (2003) (observing that the majority in *Tau'a* "erred in merely relying on federal precedent and in not conducting an independent state constitutional analysis as it relates to vehicle passengers charged with possessory crimes" and noting that "the dissent correctly pointed out" that the majority's opinion " 'de-clares open season' on automobile passengers" (footnotes omitted) (quoting *Tau'a*, 98 Hawai'i at 444, 49 P.3d at 1245 (Acoba, J., dissenting, joined by Ramil, J.) (quoting *Rakas*, 439 U.S. at 157, 99 S.Ct. 421 (White, J., dissenting, joined by Brennan, J., Marshall, J., and Stevens, J.)))).

**5.** HRS § 286–116 (1993 & Supp.1997) requires that a person having a valid driver's license and valid motor vehicle insurance shall keep such license in his or her possession at all times and a person having valid motor vehicle insurance shall keep such insurance identification card in his or her possession while operating the motor vehicle. However, no person charged with a violation of these requirements will be convicted if the person produces appropriate proof that the person was the holder of a license and insurance at the time of arrest. That section provides in relevant part:

(a) *Every licensee shall have a valid driver's license in the licensee's immediate possession at all times, and a valid motor vehicle or liability insurance identification card applicable to the motor vehicle operated ... when operating a motor vehicle,* and shall display the same upon demand of a police officer. Every police officer or law enforcement officer when stopping a vehicle or inspecting a vehicle for any reason shall demand that the driver or owner display the driver's or owner's driver's license and insurance identification card. *No person charged with violating this section shall be convicted if the person produces in court, or proves from the proper official or other records that the person was the holder of a driver's license or a motor vehicle or liability insurance identification card and policy ... theretofore issued to the person and valid at the time of the person's arrest.*

(Emphases added.) Petitioner was not cited under this section.

[DEFENSE]: ... [O]n ... March 1st, 2005, you did not observe any outward signs of any traffic violations [by Petitioner], isn't that true?

[OFFICER TAKAMIYA]: That's true.

[DEFENSE]: He didn't speed or weave or run a red light, any of those variety of traffic offenses?

[OFFICER TAKAMIYA]: ... *[N]o, it was all good.*

(Emphasis added.)

Officer Takamiya further confirmed that "*he had no first hand knowledge of whether [Petitioner] was actually driving without a license or that the vehicle was not insured.*"

[DEFENSE]: Now from February 15th to March 1st, 2005, *you don't have any first-hand knowledge whether or not he obtained a license* in those two weeks, isn't that true?

[OFFICER TAKAMIYA]: *That's true.*

[DEFENSE]: *You don't have any first-hand knowledge whether or not he obtained insurance* ... in those two weeks, isn't that true?

[OFFICER TAKAMIYA]: *That's true.*

. . . .

[DEFENSE]: ... [B]ut for all you know, *[Petitioner's vehicle] could have been insured and [Petitioner could have been] licensed on March 1st, 2005, isn't that true?*

[OFFICER TAKAMIYA]: *Yes.*

(Emphases added.)

Indeed, Officer Takamiya testified during trial that the reason he thought Petitioner had no license was "[b]ecause [he] cited [Petitioner] one to two weeks prior" and that he therefore *assumed* that Petitioner did not have a driver's license or insurance on March 1, 2005. Officer Takamiya also indicated a reason he thought Petitioner's vehicle was not insured was because he "stopped [Petitioner's] girlfriend driving that same truck one week prior [to the March 1, 2005 stop] without insurance and with the same tinted front windshield."

Direct Examination

. . . .

[PROSECUTION]: Upon [recognizing Petitioner as he was driving] *what were you thinking?*

[OFFICER TAKAMIYA]: *That [Petitioner] was driving without a license and no insurance.*

[PROSECUTION]: And what made you think that?

[OFFICER TAKAMIYA]: *Because I cited him one to two weeks prior.*

[PROSECUTION]: For that?

[OFFICER TAKAMIYA]: For driving without license and driving without insurance and also the illegal front tinted windshield.

. . . .

Cross Examination

. . . .

[PETITIONER'S DEFENSE COUNSEL (DEFENSE) ]: And *you pulled [Petitioner] over March 1st, 2005, on the assumption that he had no driver's license and was not insured?*

[OFFICER TAKAMIYA]: *Yes.*

. . . .

[DEFENSE]: You just assumed based on your prior encounter with [Petitioner] that he wasn't insured and he had no license?

. . . .

OFFICER TAKAMIYA: ... *As far as the driver's license, that's an assumption. As far as the insurance, I stopped his girlfriend driving that same truck one week prior without insurance with the same tinted front windshield.*

[DEFENSE]: ... But between the time that you stopped and cited his girlfriend and when you stopped and cited him on March 1st, ... *you don't have any first-hand knowledge whether or not the vehicle was insured in that one week's time?*

OFFICER TAKAMIYA: *That's correct.*

Assuming access to information regarding drivers' licenses and auto insurance was available, Officer Takamiya did not call the dispatch center and did not have any computerized check performed to determine whether any records indicated Petitioner had ob-

tained either a license or insurance as of March 1st.[6]

## III.

Based on the foregoing facts and testimony of Officer Takamiya, his belief that Petitioner did not have a license and insurance on March 1, 2005, was not grounded in any specific or articulable facts of an objective nature. Thus, exercising "reasonable caution," *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679, it seems no rational inferences could be drawn objectively that Petitioner was unlicensed and uninsured on that date. Officer Takamiya conceded that he observed no traffic violations by Petitioner and did not have any knowledge at all of whether Petitioner had or had not obtained a license or insurance during the interim since he was last stopped.

Furthermore, Officer Takamiya admitted that he only *assumed* Petitioner did not have a license "[b]ecause [he] cited [Petitioner] one to two weeks prior" for driving without a license. Likewise, when Officer Takamiya was questioned during cross examination as to why he thought Petitioner's vehicle had no insurance, he referred to the fact that he issued a citation to Petitioner's girlfriend for operating the vehicle in question without insurance. Thus, Officer Takamiya's belief that Petitioner lacked a license and insurance on March 1, 2005, was "an inchoate and unparticularized suspicion or hunch," *Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581, as even he admitted that it was "an assumption[.]" In

short, Officer Takamiya's assumption did not constitute reasonable suspicion required for an investigative stop. Applying an objective standard, it cannot be said, then, that "a [person] of reasonable *caution* would be warranted in believing," *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679 (emphasis added), that Petitioner lacked a license and insurance at the time of the stop.

A police officer is not excused from complying with the standards applicable to an investigative stop merely because he may have wanted to verify or check that a driver had obtained a license and insurance. These standards apply expressly to such investigative stops and have evolved specifically to balance the interests presented in two competing arguments: (1) "that in dealing with the rapidly unfolding and often dangerous situations on city streets[,] the police are in need of an escalating set of flexible responses" and (2) "that the authority of the police must be strictly circumscribed by the law of arrest and search as it has developed to date in the traditional jurisprudence of the Fourth Amendment," *Terry*, 392 U.S. at 10, 11, 88 S.Ct. 1868 (footnote omitted), and the Hawai'i Constitution.

Officer Takamiya's only basis for stopping Petitioner was his knowledge of Petitioner's prior citations and the citation of Petitioner's girlfriend, which as discussed *infra* in section IV, is insufficient to constitute reasonable suspicion.

---

**6.** Although the court admitted into evidence what appeared to be a self-authenticating document from the City and County of Honolulu's Division of Motor Vehicle, Licensing and Permits, indicating that Petitioner did not have a valid license issued to him at the time of the March 1, 2005 stop, Officer Takamiya did not testify he was aware that a valid license had not been issued to Petitioner at the time of either the February 15 or the March 1 stops. Thus, for all that is objectively in evidence, during both stops, Petitioner may have had a valid driver's license or a valid insurance policy for his vehicle although proof of such license and insurance were not in the vehicle at the time.

Of course, what is discovered subsequent to an illegal stop cannot validate the stop. If Officer Takamiya did not have a reasonable suspicion that criminal activity was afoot predicated on a "particularized and objective basis[,]" before the

stop *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), *see also*, *State v. Kim*, 68 Haw. 286, 290, 711 P.2d 1291, 1294 (1985) (holding that "under article I, section 7 of the Hawai'i Constitution, a police officer must have at least a reasonable basis of specific articulable facts to believe a crime has been committed to order a driver out of a car after a traffic stop"), then the fact that his "assumption" turned out to be correct cannot retroactively create such a basis validating the stop. *Heapy*, 113 Hawai'i at 292, 151 P.3d at 773 (holding that "a reasonable suspicion 'must be present before a stop[,]' in order for the stop to be permissible" (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (brackets in original))). Such a rule would seriously undermine the protections afforded under article I, section 7 of the Hawai'i Constitution.

·IV.

A.

As Petitioner argues, this court held in *State v. Kaleohano*, 99 Hawai'i 370, 380, 56 P.3d 138, 148 (2002), that "awareness of past arrests may, *when combined with other specific articulable facts* indicating the probability of current criminal activity factor *into a determination that reasonable suspicion,* sufficient to warrant a *temporary investigative* stop, exists." (Emphases added.). The majority admits that this court "has 'rejected the notion that a person's prior reputation ..., standing alone, was sufficient to establish *probable cause for an arrest* and has concluded that, at best, it was entitled to only minimal weight when *combined with other elements.*'" Majority opinion at 360, 173 P.3d at 507 (brackets omitted) (quoting *Kaleohano,* 99 Hawai'i at 377, 56 P.3d at 145 (internal quotation marks and citation omitted)) (emphases added). Hence, this court's recognition that an individual's reputation for criminal activity in and of itself is an insufficient basis for probable cause suggests that it would accede to the logic of the rule such that an individual's prior history of wrongdoing would be deemed an insufficient basis for reasonable suspicion justifying a traffic stop.

Other courts expressly hold that prior violations or criminal history do not give rise to reasonable suspicion that criminal activity is afoot and therefore may not serve as the sole basis for a stop. In that regard, Petitioner cites *Robinson v. State,* 388 So.2d 286, 290 (Fla.Dist.Ct.App.1980), where a police officer's knowledge of a suspect's prior arrest was the sole reason for stopping the defendant walking through an airport. The Florida Court of Appeals held "that an officer's knowledge of a suspect's previous arrest, standing alone, is insufficient to give rise to a reasonable suspicion that a crime may have been or is being committed in order to justify a lawful investigatory stop." *Id.*

Similarly, in *United States v. Jerez,* 108 F.3d 684, 693 (7th Cir.1997), the U.S. Court of Appeals for the seventh circuit acknowledged that the defendant's criminal record "would not be enough by itself" to justify an investigative stop. *See also United States v.*

*Davis,* 94 F.3d 1465, 1469 (10th Cir.1996) (holding that knowledge of the defendant's criminal record alone did not justify a *Terry* stop as such knowledge was insufficient to create reasonable suspicion); *United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.1994) (holding that "knowledge of a person's prior criminal involvement ... is alone insufficient to give rise to the requisite reasonable suspicion" for continued detention after a traffic stop); *Collier v. Commonwealth,* 713 S.W.2d 827, 828 (Ky.Ct.App.1986) (stating that "the prior record of a suspect, standing alone, will never justify a *Terry* stop").

The alleged "specific and articulable facts" in the instant case amount to no more than Officer Takamiya's prior knowledge of Petitioner's previous citations and the operation of the vehicle by his girlfriend without insurance, both within a span of one to two weeks before the subject stop. Following the logic of the aforementioned cases, this knowledge, standing alone, did not give rise to a reasonable suspicion that Petitioner was committing the offense of driving without a license or of driving without insurance specifically on March 1, 2005.

B.

The rationale behind the prohibition on reliance of prior criminal history as the sole basis for detention arises from a recognition that "[i]f the law were otherwise, any person with any sort of criminal record-or even worse, a person with arrests but no convictions-could be subjected to [an] investigative stop by a law enforcement officer at any time without the need for any other justification at all." *Sandoval,* 29 F.3d at 543. Consequently, standards governing what circumstances constitute specific and articulable facts indicative of criminal activity must be upheld in order to guard against the exercise of "standardless and unconstrained discretion," *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), of officials in executing seizures.

Because Respondent cites no other facts aside from the Officer's knowledge of Petitioner's previous citations that could, under an objective standard, give rise to the requisite reasonable suspicion, this stop was not

justified. To hold that a stop based solely on the fact of Petitioner's prior citations is proper, would eviscerate the well-settled standards pertaining to reasonable suspicion, substantially undermining the guarantee against unreasonable seizures under the Hawai'i Constitution.

## V.

The majority argues that (1) an officer's knowledge of an individual's past law violations may authorize a traffic stop if the violation of which the individual is suspected is an "ongoing" violation, majority opinion at 358, 173 P.3d at 505, (2) timeliness of information pertaining to past violations is of diminished importance in reasonable suspicion analysis involving an "ongoing" violation but nonetheless, the information surrounding Petitioner's prior violations was relatively timely, *id.* at 361, 173 P.3d at 508, and (3) stopping Petitioner "was likely to advance the state's interest in highway safety." *Id.* at 364, 173 P.3d at 511.

## VI.

### A.

As to the majority's first argument, the majority cites *Deboy v. Commonwealth*, 214 S.W.3d 926, 928–29 (Ky.Ct.App.2007). But, in *Deboy*, the investigating officer, prior to the stop, had knowledge that the defendant's license was *suspended*. *Id.* at 927. Understandably and in consonance with the specific and articulable facts standard, that court held that such knowledge on the part of the investigating officer qualified as a basis for

reasonable suspicion justifying the investigative stop. *Id.* at 929.

Obviously, this case is not authority for the majority's "ongoing" violation thesis. In the instant case, Officer Takamiya only had knowledge that Petitioner had received citations for driving while unlicensed and for driving without insurance. Contrary to the majority's opinion, such violations are *not* analogous to a violation for a suspended license because the Petitioner could have cured these violations at virtually any time after the initial citations. *Officer Takamiya even agreed during cross examination that Petitioner could have been licensed and could have been insured by March 1.*

Therefore, the violations for which Petitioner was cited should not be included in the category of so called "ongoing" violations which, under the majority's view, are excepted from the rule that past violations, standing alone, do not give rise to reasonable suspicion. Indeed, the majority cites no cases which hold that where there is no evidence that a defendant's license has been suspended or revoked, standing alone, an officer's knowledge that the defendant received a citation for driving without a license or without insurance is classified as an "ongoing" crime for which a separate reasonable suspicion standard is applicable.[7]

The crucial distinction of course between *Deboy* and this case is that, a defendant with a *suspended* license generally cannot alter his status as a person unauthorized to drive for the duration of the suspension. Thus, an officer observing a person driving, whom the officer knows has a suspended license, has the specific and articulable facts necessary

---

7. The only case that the majority cites which holds that an officer had reasonable suspicion to stop a defendant where the officer had issued a previous citation and where license suspension and revocation were not involved, is *State v. Carrs*, 568 So.2d 120 (Fla.Dist.Ct.App.1990). That case, however, is distinguishable. In that case, prior to the stop in question, the police officer had knowledge that the defendant had been cited for driving with an expired license one week prior. *Id.* at 120. However, the Florida Court of Appeal noted that "[the citing officer], who had known [the defendant] 'all his life' and saw him 'all the time,' knew that a short time earlier [the defendant] was driving with an expired license." *Id.* That court concluded that

"[the officer's] suspicion, *based on his familiarity with [the defendant]*, was reasonable." *Id.* at 121 (emphasis added). In contrast, as noted in Section II, *supra*, Petitioner here was cited for driving without a license and without insurance but there is no evidence that Officer Takamiya knew that a valid license and insurance policy had not been issued to Petitioner or knew only that Petitioner did not have documented proof thereof.

Moreover, *Carrs* is of limited persuasive value in light of the dearth of cases reaching similar decisions and in light of the number of other cases discussed *infra* in Section IV.A. which expressly state that knowledge of an individual's prior criminal history is an insufficient basis for an investigative stop.

for which the driver can be stopped. In that connection, the court of appeals in *United States v. Laughrin*, 438 F.3d 1245, 1248 (10th Cir.2006), a case cited by the majority, noted that it might have been able to affirm the district court's determination that the officer had reasonable suspicion in stopping the defendant if the officer had testified to the length of the defendant's driving suspension as this information was necessary to evaluate whether the officer was justified in his "belief that a suspension was still in effect."

However, the officer in that case apparently did not provide such information regarding the defendant's license suspension period and that court accordingly ruled that there was no reasonable suspicion that the defendant was driving without a license. *Id.* Thus, *Laughrin* illustrates that the reason a stop based solely on an officer's knowledge of an individual's prior violation of driving with a suspended license may be proper is because during a license suspension, an individual is prohibited from driving and if the officer, knowing the term of suspension, observes the individual driving, the officer would have reasonable suspicion that the individual is committing a violation. As held in *Laughrin*, without knowledge of the approximate term of suspension, an officer has no reasonable basis for suspecting a driver of a violation. Likewise, in the case of a driver previously

cited for driving without a license where no suspension or revocation is involved, the officer, upon reencountering the driver, is not legally cognizant of any impediment to the driver's operation of a vehicle.

The instant case is also distinguishable from cases like *United States v. Sandridge*, 385 F.3d 1032 (6th Cir.2004), which is cited by the majority, where the investigating officer, prior to the stop, had knowledge that there was no record in the applicable computer system of the defendant having a valid license. In *Sandridge*, the officer stopped the defendant approximately three weeks after performing a license check via computer and discovering that there was no record of the defendant having a valid license. *Id.* at 1033–34. There, the officer's reasonable suspicion that the defendant was driving without a license was not based on the officer's knowledge of any prior citations but, instead, on the fact that a review of license records revealed that the defendant did not have one. *Id.* at 1036.[8] In contrast, the officer here did not perform such a review of licensing records or insurance records.[9]

## B.

The majority characterizes as "demonstrably flawed" Petitioner's argument that an

---

8. *Sandridge* also stated that "there are no facts in the record suggesting that [the officer] should have assumed that [the defendant's] ongoing offense [of driving without a license] had ceased between" the day that the license check was run and the day that the officer stopped the defendant. 385 F.3d at 1036. This approach turns the reasonable suspicion standard on its head because it bases a stop on a past violation only. *See* Section IV. *supra*. Nonetheless, *Sandridge* is distinguishable because, *inter alia*, arguably here there was a fact in the record suggesting that Petitioner had ceased driving without a license. As stated before, Officer Takamiya noticed that Petitioner had removed the illegal tints from his windshield for which he was also cited on February 15, 2005. Petitioner asserts "it was more reasonable to infer that [Petitioner] had also taken action to correct the other two violations, instead of assuming that [Petitioner] had not obtained his driver's license and insurance."

9. Arguably, a lag period may exist between a driver being issued a license and such information being reflected in the record system used by police officers, although computerized systems

would seemingly allow an almost instantaneous update of information. In other words, there is a relatively remote possibility that a driver may have recently obtained a license and due to a potential lag in the update of the records system, the information of such license issuance may not appear in the system at the time that a police officer performs a records check.

However, this does not mean that the police officer's suspicion that a driver does not have a license is not reasonable inasmuch as a traffic record check would present a "specific and articulable fact" giving rise to an *objective* basis for reasonable suspicion. "The reasonable suspicion standard does not require an officer to rule out every possible innocent excuse for the [fact] in question before stopping a vehicle for investigation." *State v. Washington*, 737 N.W.2d 382, 387 (N.D.2007) (citations omitted). But it should also be noted that this proposition, cited by the majority from *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744, does not authorize officers to assume that an individual is repeating a crime of which he was once accused, as discussed *infra* in Section V.B.

officer's knowledge of a driver's prior violations, standing alone, can never serve as a sufficient basis for a traffic stop to determine if the driver is driving without a license or without insurance by use of a hypothetical.[10] Majority opinion at 361, 173 P.3d at 508. But, the hypothetical is inapposite because the facts posited in that scenario *i.e.*, a second stop during the *same evening* as the first stop, differ substantially from the facts of Petitioner's case. Here, a two-week period existed between the time Petitioner was first cited by the officer for driving without a license. During such period, Petitioner could have obtained a license. Hence, the hypothetical scenario has no material bearing at all on whether Officer Takamiya had reasonable suspicion to stop Petitioner.

Moreover, that an "individual could have corrected ... former criminal behavior," majority opinion at 361, 173 P.3d at 508 (emphasis omitted), is part of the rationale underlying the foundation of search and seizure standards like the reasonable suspicion standard, that is intended to protect individuals against unreasonable searches and seizures and to spare them from unlimited investigatory intrusions based upon prior transgressions. Thus, while it is true that the reasonable suspicion standard does not necessitate "rul[ing] out every possible innocent excuse" for an observed event, *Washington*, 737 N.W.2d at 387 (citations omitted), this rule does not warrant the assumption that an individual is repeating the criminal activity of which he was once accused or convicted. To decide otherwise would be equivalent to establishing a presumption that individuals once found to have committed a violation are likely to repeatedly commit such violations in the future and is clearly at odds with "the strictures against proving guilt ... by a predisposition based on past criminal acts[.]" *Kaleohano*, 99 Hawai'i at 380, 56 P.3d at 148 (quoting *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir.1995) (internal quotation marks omitted)).

The majority relies on the proposition that "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct," majority opinion at 361, 173 P.3d at 508 (quoting *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744) (other citations omitted), in support of its argument that although Petitioner could have cured the violations, such a possibility should be disregarded for purposes of reasonable suspicion inquiry. However, *Arvizu* is plainly inapposite to the majority's position. In that case the federal border patrol discovered more than one hundred pounds of marijuana in defendant's minivan after stopping the defendant. *Arvizu*, 534 U.S. at 268, 122 S.Ct. 744.

The *Arvizu* court held that reasonable suspicion of criminal activity justifying the stop was present because numerous facts and circumstances were cited by the border agent that gave rise to his suspicion that defendant was engaged in illegal smuggling activity. *Id.* at 277, 122 S.Ct. 744. The agent stated that sensors "signal[ing] the passage of traffic that would be consistent with smuggling activities" were triggered by defendant's vehicle, suggesting that a vehicle might be trying to "circumvent" the checkpoint and the triggering "coincided with the point when agents begin ... a shift change, which leaves the area unpatrolled." *Id.* at 269, 122 S.Ct. 744.

Furthermore, the border patrol agent based his decision to stop the defendant inas-

---

10. The majority challenges Petitioner's argument as follows:

> .... Let us posit that, *late one evening, an officer effects a valid traffic stop of a vehicle after witnessing an uncontested violation of the traffic or vehicle safety codes* and, incidental to that valid stop, the officer discovers that the driver is not merely without his or her license but is, in fact, unlicensed to drive in the jurisdiction. *Upon encountering the same individual later the same evening, once again driving*-at a time during which the license-issuing authority has not yet reopened-the officer would have more than reasonable suspicion to effect a second brief traffic stop of the driver to investigate whether he or she is driving without a license. *Reasonable suspicion can, therefore, be established that the defendant has fixedly refused to cease prior criminal behavior, personally observed by the officer*, absent other observed violations of the traffic or safety codes.
>
> Even in light of a more protracted interval, however, during which the individual *could* have corrected the former criminal behavior, a police officer may nevertheless have reasonable suspicion that the person has, in fact, failed to amend his or her behavior.

Majority opinion at 361, 173 P.3d at 508 (some emphases added).

much as the defendant attempted "to pretend that [the agent] was not there" as the defendant's van was approaching the agent, children in the van "began to wave at [the agent] in an abnormal pattern ... as if [they] were being instructed[,]" and the knees of the children were elevated "as if their feet were propped up on some cargo on the [van] floor." *Id.* at 270–71, 122 S.Ct. 744. Additionally, the agent was suspicious of defendant's vehicle because it made an abrupt turn onto a road that was normally frequented by four-wheel-drive vehicles rather than vehicles like that of defendant, the agent "did not recognize the [defendant's vehicle] as part of the local traffic agents encounter on patrol," and given the location of nearby picnic areas and direction of defendant's travel, the agent "did not think it likely that [defendant's vehicle] was going to or coming from" any of those picnic areas. *Id.* at 271, 122 S.Ct. 744.

*Arvizu* explained that "each of these factors alone is susceptible of innocent explanation" but, "[t]aken together, ... they sufficed to form a particularized and objective basis for [the agent's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." *Id.* at 277–78, 122 S.Ct. 744. Thus, the *Arvizu* court's statement that the "determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct[,]" *id.* at 277, 122 S.Ct. 744 (citation omitted), was made in order to emphasize that an agent may make a stop where a plethora of factors combined indicated criminal activity, notwithstanding that there may be an innocent explanation for each factor viewed in isolation.

In contrast, here, the only factors cited by Officer Takamiya for the stop were past citations of Petitioner and Petitioner's girlfriend. The multitude of factors in *Arvizu* that indicated the possibility of criminal activity then afoot was not present at the time of the subject stop in the instant case. Thus, *Arvizu* is not supportive of the majority's position.

## VII.

### A.

As to the majority's second argument, the majority engages in a lengthy discussion regarding the "freshness" or "staleness" of prior violations in relation to the stop in question. It deems *Sandridge* and *Laughrin* to be " 'bookends' with respect to the period of time during which an officer may have reasonable suspicion that a driver is engaged in an ongoing offense such as driving without a license[,]" implying that information less than 22 days old is generally not stale while information older than twenty-two weeks old is likely to be stale. Majority opinion at 363, 173 P.3d at 510.

The majority's establishment of putative "bookends" for the time period during which an officer may possess "reasonable suspicion that a driver is engaged in an ongoing offense such as driving without a license[,]" *id.* at 363, 173 P.3d at 510, is inconsistent with its statement that an inquiry into the existence of reasonable suspicion is of a "fact-intensive nature[,]" *id.* at 359–60, 173 P.3d at 506–07. Essentially, by employing a time period between twenty-two days to twenty-two weeks as a measuring stick for reasonableness, the majority establishes a line where none is meant to exist. *See id.* at 358, 173 P.3d at 505 ("When discussing how reviewing courts should make reasonable-suspicion determinations, [the United States Supreme Court has] said repeatedly that *they must look at the 'totality of the circumstances' of each case* to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (Quoting *Arvizu*, 534 U.S. at 273–74, 122 S.Ct. 744.)) (Citation omitted.) (Emphasis added.)

Presumably in the majority's view, any subsequent stop made less than twenty-two days after a violation is cited enjoys presumptive reasonable suspicion, any stop made after a period longer than twenty-two weeks would be presumptively invalid, and anything in between is open for debate. This rule is, in and of itself, arbitrary, inasmuch as the "bookends" are derived from courts considering the specific facts of a particular case and not a range that would be presumptively applicable. *See Laughrin*, 438 F.3d at 1248 (noting that "[w]hile other circuits [had] upheld traffic stops ... based on the officer's

knowledge that the motorist had no valid driver's license a week before, or twenty-two days earlier," this case was distinguishable because "[t]wenty-two days is significantly less than [twenty-two] weeks" (internal citations omitted)); *Sandridge*, 385 F.3d at 1036 (noting that *"there [were] no facts* in the record suggesting that [the detaining officer] should have assumed that [the defendant's] ongoing offense had ceased between March 5 and March 27, 2002" (emphasis added)). Manifestly, *Sandridge* and *Laughrin* do not support the importation of a twenty-two day to twenty-two week continuum so much as they support the proposition that each case must be decided afresh, looking for guidance from cases where the totality of the circumstances, not just the elapsed time, are similar.

## B.

The majority argues that timeliness of prior violation information is of limited importance in the context of ongoing violations, majority opinion at 20, and that even if timeliness is an important factor in the reasonable suspicion inquiry in this case, Officer Takamiya's one-week-old knowledge that Petitioner's vehicle lacked valid insurance and two-week-old knowledge that Petitioner was unlicensed, "give rise to reasonable suspicion to execute the March 1, 2005 traffic stop," *id.* at 363, 173 P.3d at 510. In support of this argument, the majority cites cases including *United States v. Pierre*, 484 F.3d 75, 84 (1st Cir.2007); *Sandridge*, 385 F.3d at 1034; *State v. Wade*, 673 So.2d 906, 907 (Fla.Dist. Ct.App.1996); *Carrs*, 568 So.2d at 120–21; and *State v. Decoteau*, 681 N.W.2d 803, 806 (N.D.2004), for the proposition that knowledge of prior violations approximately the same age as or older than that of Officer Takamiya's knowledge regarding Petitioner's citations was not stale and held to have given rise to reasonable suspicion justifying the stops. Majority opinion at 363, 173 P.3d at 510.

*All of these cases cited by the majority, with the exception of Carrs which is distinguishable and unpersuasive as discussed supra in footnote 7, dealt with license suspensions, in contrast to Petitioner's case where* there was no suspension and, hence, no impediment to Petitioner's immediate acquisition of a license and insurance. Moreover, the majority's focus on the time elapsed between the two stops improperly elevates one factor above all others. Again, the majority itself asserts that, "[i]n analyzing whether reasonable suspicion supported a stop, this court *considers the totality of the circumstances." Id.* at 357, 173 P.3d at 504 (citations omitted). According to the majority, the "attendant circumstances" that must be considered, along with the lapse of time between violations, include "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." *Id.* at 362, 173 P.3d at 509 (quoting *Pierre*, 484 F.3d at 83).

However, the majority focuses not on the attendant facts of the stop at issue but, rather, on whether the attendant facts justifying a *previous stop* have become "stale." This approach abrogates the specific and articulable facts test. The gravamen of Officer Takamiya's stop was obviously to check on whether Petitioner had obtained a license since Petitioner was last stopped. The determination of whether information based on a *prior* stop has or has not become so stale as to justify a *subsequent,* otherwise objectively suspicionless, stop truly places the questioned stop in the "unbridled discretion" of the officer and is a practice that has long been condemned. *See Prouse,* 440 U.S. at 661, 99 S.Ct. 1391 (condemning *"spot checks"* that amount to a "constitutionally cognizable" seizure made on the "unbridled discretion of law enforcement officials" (emphasis added)). It places our law on a slippery slope as such a formulation contains no governing principle and provides no guidance to police officers. An individual's constitutional right to be free from illegal seizure cannot hinge on the unguided determinations of whether facts and circumstances that *once* indicated criminal activity was afoot have or have not become stale at the time the officer makes the subsequent but apparently suspicionless stop.

## VIII.

The majority's third argument regarding traffic safety is, with all due respect, a make-

weight effort to buttress its ultimate holding. None of the relevant issues before this court requires a determination of whether the licensing requirements advance a legitimate government interests. There is no doubt that "[t]he state has a legitimate interest in ensuring the vehicles on its roadways are properly insured and operated by licensed drivers." Majority opinion at 26; *cf. Heapy*, 113 Hawai'i at 286, 151 P.3d at 767 (2007) (explaining that, in holding that stops based only on the fact that the driver attempted to avoid a sobriety checkpoint were illegal, this court did "not ignore the important State interest in combating drunken driving" (citing *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990))). However, the result of the stop cannot supply the reasonable suspicion that justifies the stop in the first place. *Id.* at 292, 151 P.3d 764, 151 P.3d at 773 (holding that "a reasonable suspicion 'must be present before a stop[,]' in order for the stop to be permissible" (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690)).

Thus this argument does not warrant disregarding the bases of the reasonable suspicion standard. As noted before, the rules applicable in a reasonable suspicion inquiry already reflect a compromise between or balancing of the interests of the state in preventing criminal conduct and the interests of individuals in remaining free from unreasonable searches and seizures. Overlooking the well-established tenets of the reasonable suspicion standard impermissibly tilts the balance between these interests.

### IX.

As Petitioner argues, "the fruit of the poisonous tree doctrine prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police." *State v. Fukusaku*, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997) (internal quotation marks and citations omitted). Inasmuch as Officer Takamiya's stop of Petitioner on March 1, 2005 was an unconstitutional seizure, Petitioner's motion to suppress evidence obtained from the warrantless seizure of Petitioner, or his property, or both, should have been granted by the court.

Based on the foregoing, I would reverse the ICA's April 24, 2007 judgment issued pursuant to its April 13, 2007 SDO, and the January 4, 2006 judgments of the District Court of the First Circuit, Ewa Division.